(No. 58993.—)

E & E HAULING, INC., *et al.*, Appellees, v. THE POLLUTION CONTROL BOARD *et al.* (The Village of Hanover Park, Appellant).

*Opinion filed July 17, 1985.*

Karaganis, Gail & White Ltd., of Chicago (Joseph V. Karaganis and A. Bruce White, of counsel), for appellant.

Thomas W. McNamara, Russell J. Hoover, Barry Sullivan and Julianne Bowman, of Jenner & Block, of Chicago, for appellee E & E Hauling, Inc.

Melville B. Bowen, Jr., and Barbara Preiner, Assistant State's Attorneys, of Wheaton, for appellee Du Page County Board.

Richard A. Makarski, Yvonne M. Homeyer and James P. O'Brien, of Chapman and Cutler, of Chicago, for appellee Du Page County Forest Preserve District.

JUSTICE WARD delivered the opinion of the court:

On April 27, 1982, the Du Page county board approved a proposal to expand a refuse landfill at Mallard Lake, on land owned by the forest preserve district of Du Page County (the district). The village of Hanover Park, which is adjacent to the landfill site, and certain property owners of the village (the village) filed a petition for review of the county board's decision with the Pollution Control Board (the PCB). The PCB "overturned," to use the term in its order, the county board's approval on several grounds. The county board and the district joined with E & E Hauling (E & E), the landfill's operator, in appealing the PCB's decision to the appellate court. The appellate court reversed the PCB decision and reinstated the county board's approval of the proposed expansion. (116 Ill. App. 3d 586.) We granted the village's petition for leave to appeal under Rule 315 (87 Ill. 2d R. 315).

The landfill site, originally acquired by the district in 1956, was designated for use as a landfill in 1972 through a joint resolution of the county board and the district. The purpose in approving the landfill was to create a hill for recreational use. According to the resolution, the operation of the landfill would in no case extend beyond 19 years or 1993. In 1974 the district awarded E & E a contract to operate the landfill, and the Illinois Environmental Protection Agency (the Agency) issued developmental operating permits to E & E. Since then the district has been receiving royalties from E & E which average $30,000 per month.

During the years 1979-81, the district brought several suits against E & E to halt the depositing of liquid waste

and sludge into the landfill. The district claimed that this practice was not contemplated by the original permits and that it had resulted in contamination of areas outside of the landfill. In 1981, the suits were settled. Part of the settlement called for the district and E & E to jointly petition the Agency for approval to expand the landfill. It appears that the useful life of the original landfill was much shorter than had been anticipated. The county and the district, after approving the proposed expansion through ordinances, petitioned the Agency on September 10, 1981, to permit the expansion. As of that date, it was the responsibility of the Agency to approve landfill sites and expansions through the issuance of operating permits. See Ill. Rev. Stat. 1979, ch. 111½, par. 1039(a).

Before the Agency held a hearing, the General Assembly amended the Environmental Protection Act (Ill. Rev. Stat. 1981, ch. 111½, par. 1001 et seq.) to give the power of approval of landfill locations to local authorities. (1981 Ill. Laws 3567, Ill. Rev. Stat. 1981, ch. 111½, par. 1039.1 (eff. Nov. 12, 1981).) Under the amended statute, if the proposed landfill is in an unincorporated area, the approving body is to be the county board. The 25 members of the county board in this case are also commissioners of the district, one of the co-petitioners in the application to the county board. Pursuant to the amendment, the county board held a public hearing on February 11, 1982, and on April 27, 1982, voted 16-7 to approve the proposed expansion of the landfill.

On June 1, 1982, the village petitioned the PCB for review of the county board action. (See Ill. Rev. Stat. 1983, ch. 111½, par. 1040.1(b).) An objection of the village was that the county board proceeding was fundamentally unfair because the board's membership was identical to the membership of the petitioning district. The PCB agreed, and it "overturned" the board's deci-

sion. The PCB held, too, that the board's approval was based in part on findings that were conclusory, and it remanded the dispute for a new hearing before a panel to be composed of Du Page County officials other than those serving on the board.

The county board, the district and E & E appealed the decision of the PCB to the appellate court. The village cross-appealed from the portion of the decision that remanded the cause for a new hearing. The appellate court reversed the PCB's decision, holding that the rule of necessity must be applied because there was no other forum to adjudicate the matter. The appellate court held too that the board's findings, which related to the statutory standard for site approval or expansion of pollution-control facilities, were proper, and reinstated the board's approval of the site expansion. 116 Ill. App. 3d 586.

The village argues on appeal that it was entitled to due process, and that this was denied because of the conflict of interest and bias of the county board. In the alternative, the village contends that it was entitled to a fair hearing by the language of the Act, and that the rule of necessity could not be applied to deny this right.

First, we must consider whether the village has waived its right to object to the adjudicators. The village did not raise the issue of bias at the board hearing. One citizen simply commented that the district would gain financially from the approval. Generally, of course, a failure to object at the original proceeding constitutes a waiver of the right to raise the issue on appeal. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.) "A claim of disqualifying bias or partiality on the part of a member of the judiciary or an administrative agency must be asserted promptly after knowledge of the alleged disqualification." (*Duffield v. Charleston Area Medical Center, Inc.* (4th Cir. 1974), 503 F.2d 512, 515.) The basis for this can readily be seen. To allow a party to first seek a rul-

ing in a matter and, upon obtaining an unfavorable one, permit him to assert a claim of bias would be improper. It can be said that that was the situation here. The village did not claim that it was unaware of the alleged bias before the board hearing was concluded. Though exceptions to the application of the waiver rule as appeared in *Doran v. Cullerton* (1972), 51 Ill. 2d 553, 558-59, and *Wadlington v. Mindes* (1970), 45 Ill. 2d 447, 452-53, may not be present here, we will consider the issue because in part of the likelihood of its recurrence.

We reject the village's contention that its claim of bias may be grounded on the due process clause of the fourteenth amendment (U.S. Const., amend XIV). In *Landfill, Inc. v. Pollution Control Board* (1978), 74 Ill. 2d 541, this court held that the omission of third parties from the permit-application procedure did not violate due process. At the time third parties did not have a right under the Act to participate in a hearing or to appeal from an approval of a landfill permit. This court, however, held that the existing procedure did not deny due process to third parties because section 31(b) of the Act permitted "any person" to bring a complaint against an alleged violator of the Act (Ill. Rev. Stat. 1975, ch. 111½, par. 1031(b)). This provision is available to third parties under the Act today (Ill. Rev. Stat. 1983, ch. 111½, par. 1031(b)), as well as rights and protections under sections 39.2 and 40.1 of the Act as amended (Ill. Rev. Stat. 1983, ch. 111½, pars. 1039.2, 1040.1).

Section 39.2 of the Act provides protection against arbitrary action on the part of the approving authority by setting out standards to be met for approval. Under the 1981 amendment, section 39.2 of the Act provides that the "county board of the county or the governing body of the municipality *** shall approve the site location suitability for such new regional pollution control facility." (Ill. Rev. Stat. 1983, ch. 111½, par. 1039.2(a).)

The site approval is subject to satisfying the following standards:

"(i) the facility is necessary to accommodate the waste needs of the area it is intended to serve;

(ii) the facility is so designed, located and proposed to be operated that the public health, safety and welfare will be protected;

(iii) the facility is located so as to minimize incompatibility with the character of the surrounding area and to minimize the effect on the value of the surrounding property;

(iv) the facility is located outside the boundary of the 100 year flood plain as determined by the Illinois Department of Transportation, or the site is flood-proofed to meet the standards and requirements of the Illinois Department of Transportation and is approved by that Department;

(v) the plan of operations for the facility is designed to minimize the danger to the surrounding area from fire, spills, or other operational accidents; and

(vi) the traffic patterns to or from the facility are so designed as to minimize the impact on existing traffic flows." Ill. Rev. Stat. 1983, ch. 111½, par. 1039.2.

The Act prescribes that written notice of a site-approval request must be served on "any party" who is the owner of property within 250 feet of the proposed landfill. (The village met that requirement.) (Ill. Rev. Stat. 1983, ch. 111½, par. 1039.2(b).) The Act provides for a minimum of one public hearing on a request for site approval:

"At least one public hearing is to be held by the county board or governing body of the municipality within 60 days of receipt of the request for site approval, such hearing to be preceded by published notice in a newspaper of general circulation published in the county of the proposed site, and notice by certified mail to all members of the General Assembly from the district in which the proposed site is located and to the Agency. The public hearing shall develop a record sufficient to form

the basis of appeal of the decision in accordance with Section 40.1 of this Act." Ill. Rev. Stat. 1983, ch. 111½, par. 1039.2(d).

If a county board or other approving authority denies a petition for a permit for a proposed site, the applicant may appeal the decision to the Pollution Control Board. (Ill. Rev. Stat. 1983, ch. 111½, par. 1040.1(b).) If the petition is approved, any "third party *** who participated in the public hearing conducted by the county board *** may petition the [PCB]" for review of the approval. (Ill. Rev. Stat. 1983, ch. 111½, par. 1040.1(b).) In reviewing denials and approvals, the PCB, under the statute must consider the "fundamental fairness of the procedures used by the county board *** in reaching its decisions." (Ill. Rev. Stat. 1983, ch. 111½, par. 1040.1(a).) Before the amendments to the Act, permit applications were acted on solely by the Agency; no public hearings were required and no standards for approval were set out. Denials of applications for permits could be appealed to the PCB, but permit approvals were not appealable. We deem that the rights of third parties are adequately recognized and secured.

In contending that the board was disqualified from acting as decision-maker of the permit application, the village first claims that the board had an interest in the permit application. This interest was the $30,000 per month, on the average, that the board and its members in their capacity as commissioners of the district received. These payments, of course, were not a direct pecuniary benefit to the commissioners, but rather a benefit to the community that they serve. A classic example of an impermissible indirect interest appeared in *Ward v. Village of Monroeville* (1972), 409 U.S. 57, 34 L. Ed. 2d 267, 93 S. Ct. 80. There the defendant was tried and convicted of two traffic offenses by the mayor of the village. The mayor had a broad control over the village

government and its finances, and traffic fines generated a "substantial portion" of the village's annual revenue. The Supreme Court held that though the interest was not a personal one, the important impact that fines had on village finances that the mayor supervised created sufficient temptation not to accord the defendant due process of law. The situation here is clearly distinguishable. The revenue from the landfill of $30,000 per month must be considered in perspective. The annual budget of the district was $163.5 million in 1982. The mayor's reliance in *Ward* on traffic fines was obviously a different matter.

More fundamentally, the board should not be disqualified as a decision-maker simply because revenues were to be received by the county. County boards and other governmental agencies routinely make decisions that affect their revenues. They are public service bodies that must be deemed to have made decisions for the welfare of their governmental units and their constituents. Their members are subject to public disapproval; elected members can be turned out of office and appointed members replaced. Public officials should be considered to act without bias. *Cf. Memphis Light, Gas & Water Division v. Craft* (1978), 436 U.S. 1, 56 L. Ed. 2d 30, 98 S. Ct. 1554; *Goss v. Lopez* (1975), 419 U.S. 565, 42 L. Ed. 2d 725, 95 S. Ct. 729.

It does not seem unusual that a landfill would be proposed for location on publicly owned property. The Act was amended to place decisions regarding the sites for landfills with local authorities and to avoid having a regional authority (the Agency) in a position to impose its approval of a landfill site on an objecting local authority. Here, a local authority approved the landfill, but the village, a local authority itself, is alleging that the county board should be disqualified because it owns the landfill property. We do not consider that the legislature in-

tended this unremarkable factual situation to make "fundamental fairness of the procedures" impossible.

The village next claims that the hearing was unfair because both the county and the district had earlier approved the landfill by ordinance. The village thus is claiming a type of bias that has been called "prejudgment of adjudicative facts." (See K. Davis, 3 Administrative Law Treatise sec. 19:4 (2d ed. 1980).) But the ordinances were simply a preliminary to the submission of the question of a permit to the Agency. Subsequently, the Act was amended and the board was charged with the responsibility of deciding whether to approve the landfill's expansion. The board was required to find that the six standards for approval under the amended act were satisfied. It cannot be said that the board prejudged the adjudicative facts, *i.e.*, the six criteria. This conclusion is supported by the line of decisions that there is no inherent bias created when an administrative body is charged with both investigatory and adjudicatory functions. See, *e.g.*, *Withrow v. Larkin* (1975), 421 U.S. 35, 47-50, 43 L. Ed. 2d 712, 723-25, 95 S. Ct. 1456, 1464-65; *Scott v. Department of Commerce & Community Affairs* (1981), 84 Ill. 2d 42, 54-56.

We consider that the appellate court properly held that the board was correct in finding that the statutory standards had been satisfied, and that portion of the appellate court's judgment is affirmed.

The appellate court's conclusion that the PCB erred in deciding that the board was disqualified from conducting a hearing was correct, but its reasoning was erroneous. The court deemed that the board was an improper tribunal, but since there was no other forum available, the rule of necessity required the board to act as the forum. As we have stated here, the board was not to be judged biased and disqualified from acting. Because the appellate court's conclusion to reverse the decision of the

PCB was correct, we affirm that portion of the judgment also.

*Judgment affirmed.*

JUSTICE SIMON, dissenting:

In view of the specific findings of the Du Page county board, I perceive the operation by E & E Hauling, Inc., of an expanded landfill in the Mallard Lake Forest Preserve to be fraught with hazards. These dangers include diminution of property values in the neighborhood, pollution of the west branch of the Du Page River as well as the underground water supply, and threats to the public health and safety. My perception and this dissent are based upon the reservations and concerns in the resolution adopted on April 27, 1982, by the county board of Du Page County to satisfy the requirements of Public Act 82—682 (Ill. Rev. Stat. 1983, ch. 111½, par. 1039.2). The resolution contains very specific statements of the county board's doubts and qualifications, while indicating compliance with the six criteria established by the statute for determining the suitability of a site location for a landfill by only vague and general statements in the words of the statute. Because the county board's specific findings do not support its conclusions, I believe that the appellate court erred by affirming the county board's decision. In my judgment, this portion of the appellate court's opinion was deserving of much lengthier treatment than disposition by the one-sentence affirmance in the next to the last paragraph of the majority opinion. While I appreciate the care and effort with which the appellate court in its opinion set forth the evidence in this case, it is the responsibility of the county board to determine the facts. Therefore, I believe that this court should accord more weight to the specific findings of the county board than to the appellate court's evaluation of the evidence.

Before reciting the specific language which indicates that the appellate court failed to consider the entire resolution in deciding that the county board's conclusion was supported by the evidence, I feel obligated to refer to the strange history of this addition to an existing landfill. The operation of the landfill in question, which was authorized by agreement dated June 1, 1974, between the forest preserve district of Du Page County and E & E Hauling, following county board approval, was the subject of extensive litigation in 1979. In E & E Hauling, Inc. v. Forest Preserve District (Cir. Ct. Du Page County), No. 79CH94, E & E Hauling, Inc. v. Forest Preserve District (N.D. Ill.), No. 79C223, and People v. E & E Hauling (Cir. Ct. Du Page County), No. 79CH240, the forest preserve district, of which all of the county commissioners were members, claimed that the landfill was unsafe and improperly operated. In two of the cases, the forest preserve district submitted affidavits of experts to support that assertion. As the majority points out, the forest preserve district complained that E & E Hauling was depositing liquid waste and sludge in the landfill. But instead of pursuing its efforts to exclude E & E Hauling from forest preserve land because of its failure to comply with proper safeguards and procedures in operating the landfill, the forest preserve settled this litigation by giving E & E Hauling a handsome windfall—E & E Hauling was allowed to substantially expand the landfill operation from 340 acres to 560.1 acres and to continue the landfill operation long beyond the 1993 termination date of the 1974 contract between E & E Hauling and the forest preserve.

Equally puzzling is how the county board and the appellate court found sufficient evidence to permit the expanded landfill to operate into the next century in view of specific findings in the county board's resolution which completely negate its conclusions. Repeatedly the

resolution announces affirmative conclusions in the words of the statute based on specific findings which not only do not support its decision, but which, in fact, are inconsistent with them.

For example, the resolution states: "The expanded facility is so designed, located and proposed to be operated that the public health, safety and welfare will be protected." Yet the resolution raises serious doubts regarding the competence of E & E Hauling to operate a landfill in a manner which will not endanger the public health, safety and welfare. The resolution contains the following specific findings:

"There was considerable testimony relating to the performance of the applicant, *or lack of performance,* as the case may be. An elaborate leachate collection system was designed to protect the surrounding area in the event that substantial quantities of leachate were generated. The weight of the evidence indicated that much of this system was never put in place, and that *the applicant did not conform to the terms of his original agreement* with the forest preserve district of Du Page County in this respect. *Because the landfill is immediately adjacent to the west bank of the Du Page River, this becomes a serious concern.*

Testimony was also given relating to *the inadequate housekeeping practices of the site operator, reflected in blowing papers, garbage, and in unpleasant odors being generated,* although conditions appear to have improved in the last few years.

Testimony was also entered into the record concerning the utilization for fill of substantial quantities of sludge. This practice appears to have been stopped by the Forest Preserve Commission several years ago, but this was only achieved by court action. Some of the testimony seemed to indicate that in the past the quantities of sludge which were being deposited posed a probable danger to the stability of the hill, as well as creating the possibility of dangerously high liquid levels in the hill if this

practice were to continue (sludge is mostly water). This factor, combined with the incomplete leachate collection system, could have posed a substantial danger of contamination to the community. The site operator's practices seem to have improved in the past few months, but *the record must not overlook the fact that the Forest Preserve District had to go to court to protect the public health, welfare and safety. The site operator has been less than diligent in his concern for potential hazards as well as nuisances, as reflected in the testimony.*

\* \* \*

Geologically, as we have pointed out, the site is a near ideal one. *Failure of the operator to install the required leachate collection system exactly as designed, and to appropriately police the site, has caused reservations on this score, however."* (Emphasis added.)

Dr. Robert Ginsburg, research director for Citizens for a Better Environment, who testified on behalf of the village of Hanover Park, underscored the danger of permitting an operator with the performance history of E & E Hauling to operate a landfill with the following sensible and constructive observation:

"Finally, I would like to comment on the importance of proper operation of a landfill. The public's ability to get complete technical data on a landfill site will always be limited. Thus, we must rely, however much we regret it, on the good judgment and care taken by the operator of a landfill. Sloppy and careless management can turn the best site into a disaster.

*The past record of E & E Hauling is, to say the least, not exemplary. The company did not follow its original construction plans and did not tell anyone that it had changed its design."* (Emphasis added.)

It is thus apparent to me that based on its past performance in this particular landfill, so long as E & E Hauling continues to operate it, the county board's conclusion that the "expanded facility is so \*\*\* proposed to be operated that the public health, safety and welfare

will be protected" is against the manifest weight of the evidence. Instead of being rewarded with a more valuable contract E & E Hauling deserves to be removed from the Mallard Lake Forest Preserve.

Furthermore, the county board's conclusion that "the expanded facility is so *** located *** that the public health, safety and welfare will be protected" is challenged by the following specific findings included in the resolution:

> "Concern was expressed in the testimony about the dumping of hazardous or special wastes. *Although no permit for hazardous waste disposal has been granted to the Mallard Lake Landfill, it is not inconceivable that some hazardous wastes have been dumped there, and that some time in the future they will surface.*
>
> *** Furthermore, *the proximity of the site to the west branch of the Du Page River, possibly inappropriate contours, and large amounts of deposited sludge, leave us some concerns.*
>
>                                          * * *
>
> *It is difficult to visualize all of the potential hazards of accidents which could occur at any particular site.* Fires seem remote unless spontaneous combustion could occur. Proper compaction and consequently elimination of oxygen would make this unlikely. No hazardous wastes are supposed to be involved so that spills should not be a major concern." (Emphasis added.)

So long as hazardous and offensive wastes have already been dumped at this site and there is serious enough concern about this site for the county board to specifically note the possibility of contaminating the west branch of the Du Page River, I fail to understand how the county board's conclusions can be supported. Because this conclusion is against the manifest weight of the evidence, it is our responsibility to require additional exploration before we approve of practices which may endanger an important body of water.

I also fail to understand how the appellate court concluded that the statement in the resolution that this facility "is necessary to accommodate the waste needs of the area it is intended to serve" is not against the manifest weight of the evidence. The record lacks evidence to support a determination of what the waste needs of the area would be after 1993, and what alternatives to the Mallard Lake Forest Preserve site would be available. The county board's only findings on this criterion were, in pertinent part, as follows:

> "Urban development has now come on its northern and western boundaries, so that it is not as suitable a location as it once was."

The resolution contained no findings to support the conclusion that the expanded facility is necessary for the period after 1993, and there were no findings concerning possible alternatives. It is impossible to decide whether the expanded facility is *"necessary"* unless the court is informed of what alternatives to the site there may be, even conceding the obvious, that there will be a need to place garbage somewhere after 1993.

The county board's further observation that "most of the homes in the area of the Mallard Lake Forest Preserve were purchased by people who should have been aware that a disposal site was adjacent to them" is irrelevant. These homeowners could not foresee that the site would be expanded, that the dumping operation would be continued long after 1993, or that E & E Hauling would be as negligent and careless as it has been in conducting the operation. Moreover, the finding that "this site is, on a relative basis, more appropriate than most other sites might be" raises the possibility that after 1993 other sites might be as or more appropriate than the present site. Without further evidence, it is impossible to determine the necessity for this site after 1993.

Another conclusion against the manifest weight of

the evidence is that "the facility is located so as to minimize incompatibility with the character of the surrounding area and to minimize the effect on the value of the surrounding property." This statement is followed by specific findings which, although intended to support the conclusion, in fact require an opposite result:

"Berms have been constructed on the west and north sides of the site to minimize the visual effects of the landfill. Testimony indicated that *odors continue to be a problem* \*\*\*. *[S]ite housekeeping seems to have left a good deal to be desired. Debris, particularly paper, is frequently found on the roads or in the yards adjacent to the site.* \*\*\* Both truck and bulldozer *noise presented some problems* in homes immediately adjacent to the landfill." (Emphasis added.)

These findings establish that the landfill operation at this site has been highly intrusive and offensive to the residents of the village of Hanover Park. The odors from the site and the litter in the area clearly detract from the quality of life of these residents. I fail to understand how the evidence can support a finding that this facility is located to minimize incompatibility with the character of the surrounding area when the site is next to single-family homes, borders an area zoned for residential uses, and exposes those homes to offensive odors, litter, noise, the possibility of rodents, and the annoying flares which accompany the venting of methane gas which is produced by this garbage dump.

Finally, the county board's conclusion that "the plan of operation for the expanded facility is designed to minimize the danger to the surrounding area from fire, spills, or other operational accidents" is contradicted by the specific findings which follow that statement. I have already pointed out that the resolution concedes that "it is difficult to visualize all of the potential hazards of accidents which could occur" at this site and the concern

that the county board expressed because of the "problem of a potentially inadequate leachate collection system, as well as the potential contamination of either the west branch of the Du Page River or adjacent wells." However, that is not all. The resolution goes on to express other concerns in the following language:

> "*The major concern left unanswered by the testimony was the potential danger that it could occur five or ten years from now when large quantities of leachate may start to be produced and flow downhill.* The Forest Preserve and the site operator need to face that problem now, so that we will not be faced with a *crisis or an expensive solution some years from now.*" (Emphasis added.)

The record is devoid of evidence indicating that there will not be a serious problem in "five or ten years," and therefore the conclusion that this site is suitable for an expanded landfill is against the manifest weight of the evidence.

The resolution contains yet another contradiction. It is the condition imposed by the county board and incorporated in the resolution that "[t]he site operator shall be required to assume liability affirmatively for all contamination of waterways or ground water during the life of the landfill and for a period of one year subsequent to the completion of the landfill and shall carry comprehensive liability insurance of at least twenty million dollars during this period."

The insurance requirement suggests that the county board had grave reservations about its action. Little is accomplished by requiring E & E Hauling to be affirmatively liable for contamination of waterways or ground water if, as a result of E & E's operation of the expanded landfill, the water is contaminated. No amount of money will be able to reverse the damage to our precious natural resources once E & E Hauling has polluted

them. Unlike the members of the county board, I am not prepared to take a chance on contamination of the water supply irrespective of the amount of comprehensive liability insurance which the site operator is required to provide.

The problems inherent in this landfill operation appear to be even more severe than those this court recently considered in *Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, involving a landfill operation which this court did not allow. In that case, nearby landowners were also bothered by offensive odors, litter and rodents. There were also concerns with water pollution, with leachate decomposition, and with possible methane-gas explosions. However, the site operator in *Cosmopolitan National Bank* displayed more care in operation and concern for public safety than E & E Hauling has shown at this site. In addition, in *Cosmopolitan National Bank* there was no major body of water adjacent to the site that was in as serious danger of being polluted as is the west branch of the Du Page River.

If this case had arisen in the procedural context of an attack upon a zoning ordinance, we could not permit the landfill to proceed. (*Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302.) I cannot understand how we can reach a different result because the county board, after the hybrid quasi-administrative, quasi-legislative proceeding directed by the statute (Ill. Rev. Stat. 1983, ch. 111½, par. 1039.2), adopted a resolution filled with internal inconsistencies which permitted E & E Hauling to expand the landfill. My concern based on the negative findings set forth in the resolution is that, by permitting the expanded landfill to proceed, in time we may have another *Wilsonville* case on our hands. See *Village of Wilsonville v. SCA Services, Inc.* (1981), 86 Ill. 2d 1.