FREEDOM OIL COMPANY, Petitioner, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Fourth District    No. 4—94—0786

Argued June 19, 1995.—Opinion filed September 21, 1995.

Jon K. Ellis (argued), of Springfield, for petitioner.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Susan Frederick Rhodes, Assistant Attorney General (argued), of counsel), for respondents.

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

Petitioner, Freedom Oil Company (Freedom), filed its petition for direct review in this court of a supplemental opinion and order of the respondent, Illinois Pollution Control Board (Board). (*People v. Freedom Oil Co.* (June 6, 1994), \_\_\_\_ Ill. PCB Supp. Op. 93—59.) The order appealed from changed the amount of the penalty assessed against Freedom as recited in a previous opinion and order (*People v. Freedom Oil Co.* (May 5, 1994), \_\_\_\_ Ill. PCB Op. 93—59) (hereinafter *Freedom Oil*). Freedom challenges (1) the result of the June 6 special meeting, which it argues was not a valid meeting (415 ILCS 5/5(a) (West 1992)); (2) the Board's characterization of the change in penalty as a clerical error; and (3) the Board's authority to hold a meeting by telephone conference call. The Board questions this court's jurisdiction over Freedom's petition for review. We have jurisdiction and affirm the Board's opinion and order.

On March 19, 1993, the Illinois Attorney General (AG), on behalf of the People of the State of Illinois (the People) and at the request of the Illinois Environmental Protection Agency (IEPA), filed a two-count complaint with the Board against Freedom. The violations alleged involved the failure to investigate and report releases from underground storage tanks at two separate locations owned by Freedom. The People sought a $30,000 penalty for each release and an additional $10,000 for each day the violations continued.

After a hearing, the Board found Freedom to be in violation of IEPA regulations at both of its facilities. In post-hearing briefs filed by the parties, the AG sought and Freedom Oil opposed imposition of a $30,000 civil penalty for the two incidents of releases from the underground tanks. In its 13-page written order issued on May 5,

1994, the Board assessed a penalty of $15,000 against Freedom in setting forth the following reasoning:

"Examining the duration of the violations, again we consider that the release at the Savoy site was recorded on November 22, 1989, almost 3 and 1/2 years before the complaint was filed in this action on March 19, 1993. The release at the Oblong site was reported on April 4, 1991, almost 2 years before this action was filed. In the interim, the Agency sent Freedom three letters concerning the Savoy site and two letters concerning the Oblong site. In each letter, the Agency notified Freedom of the information it must collect at each site, and that the same must be submitted to the Agency. Even with these letters, Freedom did next to nothing to comply, and, as of this date, Freedom still has not complied with the applicable investigation and reporting requirements. Freedom's recalcitrance demonstrates a lack of due diligence to comply with the Board's regulations.

Addressing the gravity of the violation, again we must correct Freedom. These violations are not mere paper violations. Without the required reports and sampling data, the Agency has no way of knowing the extent of contamination that may exist at either site. For at least 3 and 1/2 years and two years at the Savoy and Oblong sites, respectively, the presence of ground water, as well as soil, contamination remained undetermined. The reporting requirements are there to prompt the investigation necessary to determine the extent of contamination and remediation. Left uninvestigated, the pollution can migrate and cause more damage than it did initially. Not only did Freedom fail to submit the reports despite the Agency's repeated requests for them, it also failed to undertake the investigations required at each site to insure that the environment is protected.

Until the extent of contamination is known at each site, the economic benefit accrued by Freedom due to its recalcitrance cannot be accurately determined. While the cost of the investigations could be estimated, the costs saved by deferring any necessary remediation cannot be. Without the investigation, we only know that the remedial costs could range between zero and multiple millions of dollars. ***

Freedom's failure to comply, the fact that the extent of contamination remains unknown because of that failure, and Freedom's recalcitrance over the three year period lead the Board to conclude it must assess a penalty sufficient to deter continuing violations at these sites and future violations at other UST sites owned by Freedom. *The Act authorizes the Board to assess a civil penalty of up to $50,000 per violation, and an additional civil penalty of not to exceed $10,000 for each day during which a violation continues.*

*The Agency seeks a penalty of $30,000 and an award of costs and fees* pursuant to Section 42 of the Act. In support of a penalty in that amount, the Agency cites Freedom's blatant disregard for the applicable regulations. For the most part, Freedom ignored the Agency's letters warning Freedom that it was in possible violation of those regulations. Freedom went so far as to promise soil sampling in its response to the NORL for Savoy, but then went on to ignore the subsequent CIL and Pre-Enforcement Conference Meeting letter sent by the Agency. Concerning the Oblong site, Freedom did submit reports but only after it received a CIL and, thereafter, it ignored the Agency's request for more information concerning the extent of contamination evidenced by those reports. Finally, Freedom has taken no action to correct the contamination at the Oblong site, and simply submitted information insufficient for the Agency to determine if remediation is necessary due to the release at the Savoy site.

The Board finds that Freedom acted with knowledge of and blatant disregard for the applicable Board regulations. *The Board further finds no facts or circumstances which would mitigate the penalty requested. Therefore, the Board orders Freedom \*\*\* to pay a penalty of $15,000* into the Environmental Protection Trust Fund. In setting this penalty amount, we have considered the costs Freedom saved through its refusal to property [*sic*] investigate either site, the costs saved through its refusal to submit adequate 20[-] and 45[-]day reports at either site, and its recalcitrance in the face of repeated attempts by the Agency to obtain this information. We have also considered the increased threat to the public health and welfare posed by the delay in quantifying the releases, and the costs associated with remediating such contamination. Finally, we have considered what would deter Freedom from engaging in such behavior in the future." (Emphasis added.) (*Freedom Oil,* at 9-11.)

On May 23, 1994, Freedom caused a check to be issued in that amount.

On Friday, June 3, 1994, counsel for the Board left a message for counsel for Freedom to advise him the Board had scheduled a special meeting on Monday, June 6, 1994, for the purpose of correcting its opinion and order issued on May 5. Counsel for the Board reached Freedom's counsel by telephone on the morning of June 6 and verified the message left on June 3. Notice of the Board's special meeting to be held on June 6, 1994, was posted on June 3, 1994.

On June 6, the Board issued what it entitled a "Supplemental Opinion and Order." In the three-page order, the Board indicated it was correcting a clerical error in its May 5 order pursuant to title 35,

section 101.301 of the Illinois Administrative Code (35 Ill. Adm. Code § 101.301 (1992-93)); the Board stated it had voted 6 to 0 on May 5 to assess a penalty against Freedom in the amount of $30,000, not $15,000, and proceeded to set forth a corrected order. Freedom was provided a facsimile copy of the supplemental order on June 6 and also received a copy by certified mail on June 9, 1994.

On June 9, 1994, *prior* to receiving a copy of the order of June 6 by certified mail, Freedom filed a petition for review of the order of May 5 with this court. On July 12, the People moved to dismiss the petition for review for failure to name the Board as a party. The petition was dismissed on that basis on July 19, 1994. *Freedom Oil Co. v. People* (4th Dist. 1994), No. 4—94—0537 (order of dismissal).

Meanwhile, on July 11, Freedom filed with the Board a motion to reconsider and vacate the Board's supplemental opinion and order. The People filed a response and the motion was denied on August 11, 1994. Freedom filed this petition for review on September 2, 1994.

■ The Board first contends this court's dismissal of Freedom's original petition for review filed June 9, 1994, precludes further review. This court's dismissal of Freedom's first petition was not a decision on the merits. Instead, Supreme Court Rule 335(a) (134 Ill. 2d R. 335(a)) and section 3—107(a) of the Administrative Review Law (735 ILCS 5/3—107(a) (West 1992)) provide the inclusion of the administrative agency rendering the decision as a party to a petition for review is jurisdictional. (See *McGaughy v. Illinois Human Rights Comm'n* (1995), 165 Ill. 2d 1, 649 N.E.2d 404.) Therefore, we dismissed the petition solely for lack of jurisdiction.

Section 41 of the Environmental Protection Act (Act) (415 ILCS 5/41 (West 1992)) provides for review of a final order of the Board by filing a petition for review within 35 days of the entry of the order in accordance with the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 1992)). By rule, the Board permits any party to file a motion for reconsideration or modification of a final order within 35 days of issuance of the order. (35 Ill. Adm. Code §§ 101.246(a), 101.300, 103.240 (1992-93).) The Board's rules further provide the filing of a motion for reconsideration or modification stays the effect of the final order until final disposition of the motion after which the 35 days run anew. 35 Ill. Adm. Code §§ 101.246(c), 103.240 (1992-93).

Section 101.301 of the Board's rules (35 Ill. Adm. Code § 101.301 (1994)) provides the Board may on its own initiative correct clerical errors contained in its orders prior to filing of an appeal. While there is no mention in the Board's rules of a stay of the 35-day appeal period pending the Board's action to correct its order, this is not necessary because once the order has been corrected, it is essentially the

final order from the entry of which a 35-day appeal period then begins to run and the previous order becomes only an interlocutory order.

In this case, the Board stated it was granting Freedom an additional 35 days in which to appeal its order. While it is not clear the Board had the authority to grant an extension, it was not necessary for the Board to take this action at all as the entry of the corrected order on June 6, 1994, started a new 35-day period in which Freedom could file a petition for review or move for reconsideration of the order. Thus, we find we have jurisdiction over this appeal because Freedom filed its notice of appeal within 35 days of the denial of its motion to reconsider the June 6, 1994, order which corrected the clerical error in the order of May 5, 1994.

■ Freedom does not argue with the Board's power to correct errors upon its own initiative pursuant to section 101.301 but insists the change made in this case was not the mere correction of a clerical error but the doubling of the penalty assessed against it. However, Freedom can point to nothing in the record to substantiate its contention.

The minutes of the Board meeting of May 5, 1994, include a recitation of the adoption of an opinion and order in a dozen cases, including the one against Freedom. The vote on Freedom's case is recorded as 6 to 0 in favor of adopting the order, with one member concurring. No mention is made in the minutes of the penalty assessed in any of the cases decided that day. The minutes of the June 6 meeting state it was a special meeting held for the sole purpose of amending the order in Freedom's case after its adoption. The vote is recorded as 6 to 0 in favor of adopting what is termed a "supplemental opinion and order" with one concurrence. The order adopted on June 6 recites within it the fact the Board voted on May 5 to assess the penalty of $30,000 while the order actually read $15,000. The penalty requested by the People was $30,000 and the findings of the May 5 order indicated Freedom had acted with "blatant disregard" for the Board's regulations and there were "no facts or circumstances which would mitigate the penalty requested." By its findings, it appears the Board intended to assess the penalty requested by the People and the numbers used in the order were in direct contradiction to the reasoning stated within the order. In addition, the written concurrence of one of the Board's members with the June 6 order states he concurs but would have assessed an even larger penalty against Freedom. The record supports a finding the Board was actually correcting a clerical error and not increasing Freedom's penalty.

■ Freedom also argues the Board had no specific statutory authority to hold official meetings by telephone conference. The

Board first contends Freedom has waived this argument by not previously raising it before the Board in its motion for reconsideration. Generally, issues and defenses not previously raised before the Board cannot be raised for the first time on direct review. (*E&E Hauling, Inc. v. Pollution Control Board* (1985), 107 Ill. 2d 33, 38, 481 N.E.2d 664, 666.) Freedom argues its motion for reconsideration contained a paragraph stating "four Board members were not even physically present at the meeting but were 'telephonically connected' " and this should be enough to get beyond a finding of waiver. Freedom did not argue this point had any legal significance and was not ruled upon by the Board, but the Board was made aware Freedom thought the telephone conference procedure to be peculiar.

The waiver rule is a limitation on the parties and not upon the jurisdiction of the reviewing court. (*Rutledge v. St. Anne's Hospital* (1992), 230 Ill. App. 3d 786, 789, 595 N.E.2d 1165, 1168.) The issue of holding public meetings by telephone conference is likely to recur and both sides have briefed the issue on appeal. We find this circumstance falls within an exception to the waiver rule. This court may consider a matter not previously raised because of its likelihood of recurrence. (*E&E*, 107 Ill. 2d at 39, 481 N.E.2d at 666.) Accordingly, we shall deal with the merits of the issue.

■ Freedom contends the Board did not have the authority to conduct a meeting by telephone conference because it has no statutory authority to do so. Neither the Act which created the Board (415 ILCS 5/5 (West 1992)) nor the Board's own rules as found in title 35 of the Illinois Administrative Code (35 Ill. Adm. Code § 101.100 *et seq.* (1992-93)) provide for telephone meetings by the Board. Generally, an administrative agency is a creature of statute and has no general or common law powers. (*City of Chicago v. Fair Employment Practices Comm'n* (1976), 65 Ill. 2d 108, 112-13, 357 N.E.2d 1154, 1155.) However, the absence of specific authority in the Act to conduct Board meetings by telephone conference does not indicate a legislative intent to prohibit such meetings. In performing its specific duties, an administrative agency has wide latitude to accomplish its responsibilities. (*Lake County Board of Review v. Property Tax Appeal Board* (1988), 119 Ill. 2d 419, 427-28, 519 N.E.2d 459, 463.) The Board's conduct of a special meeting by telephone conference falls within the Board's specific authority to conduct meetings.

As the Board is subject to the Open Meetings Act (5 ILCS 120/1 *et seq.* (West 1992)), there is also the question whether meetings held by telephone conference violate the Act. Freedom argues a quorum must be physically present in the same room to constitute a meeting. Under the Open Meetings Act, "meeting" is defined as "any gather-

ing of a majority of a quorum of the members of a public body held for the purpose of discussing public business." (5 ILCS 120/1.02 (West 1992).) The minutes of the Board's meeting of June 6 indicate only two of the Board's members were actually present at the meeting site and four members were "telephonically connected" and answered present. Freedom cites no authority which prohibits administrative agencies in Illinois subject to the Open Meetings Act from conducting meetings by telephone conference or which makes invalid any actions taken at such meetings. Nor does Freedom dispute the Board followed the statutory and regulatory requirements in scheduling, giving notice, and conducting its June 6 meeting but only questions whether a telephone conference qualifies as an open meeting.

This appears to be a case of first impression in Illinois. There is nothing within the Open Meetings Act which specifically prohibits conducting a meeting by telephone conference or requires members of a public body to be in each other's physical presence to establish a quorum. While this issue has not been addressed by the courts, it has been the subject of an opinion letter of the AG. (1982 Ill. Att'y Gen. Op. 124.) An opinion of the AG, while not binding on the courts, is to be given considerable weight especially on matters of first impression. (*Bonaguro v. County Officers Electoral Board* (1994), 158 Ill. 2d 391, 399, 634 N.E.2d 712, 715.) The public policy goal of the Open Meetings Act is to conduct the business of the people openly. (5 ILCS 120/1 (West 1992).) The opinion of the AG is that furtherance of the goals of the Open Meetings Act requires the inclusion of telephone conferences within the definition of a meeting under the Open Meetings Act. 1982 Ill. Att'y Gen. Op. 128.

The AG was asked to determine whether the Open Meetings Act or any other State law prohibited the Board of Elections from conducting its official business by means of a telephone conference pursuant to its regulations, provided a quorum is present and all requirements of the Open Meetings Act are met. (1982 Ill. Att'y Gen. Op. 127.) The AG first considered the Open Meetings Act's definition of "meeting," which requires a gathering of a quorum. (5 ILCS 120/1.02 (West 1992).) The AG noted the definition of "gathering" as a physical coming together of persons in a group (Webster's Third New International Dictionary 940 (1986)). However, the AG found with the technology presently available, a group of persons may come together by "non-corporal" means as well. (1982 Ill. Att'y Gen. Op. 127.) The AG reasoned the common practice of governmental officials to "gather" to conduct public business by telephone could not be ignored and if telephone conference calls were excluded from the definition of meetings, public officials could circumvent the goals of the

Open Meetings Act simply by discussing public business over the telephone. 1982 Ill. Att'y Gen. Op. 128.

The AG then considered whether a telephone conference call could satisfy the Open Meetings Act's mandate of public bodies meeting in public meetings. The AG concluded where a telephone conference call is broadcast over a speakerphone so the broadcast is open to members of the public at all offices of the agency, as it was in the case of the Board of Elections, accessibility of the public is satisfied. In fact, the AG opined the meeting was more accessible to the public because speakerphones were available in more than one location whereas a meeting with all members at one site is only accessible at that site. (1982 Ill. Att'y Gen. Op. 128.) The AG concluded a meeting held by telephone conference conducted pursuant to the regulations of the Board of Elections complies with the Open Meetings Act. 1982 Ill. Att'y Gen. Op. 129-30.

While this issue is one of first impression in Illinois, it has been considered in several sister States. The Supreme Court of Pennsylvania, using almost identical reasoning as the Illinois AG, found the use of a speakerphone in a public meeting in which only one out of three members was present at the meeting site did not violate that State's sunshine laws, similar to the Open Meetings Act. (*Babac v. Pennsylvania Milk Marketing Board* (1992), 531 Pa. 391, 613 A.2d 551.) Similar results were reached in several other States. *Goode v. Department of Social Services* (1985), 143 Mich. App. 756, 373 N.W.2d 210; *Stockton Newspapers, Inc. v. Redevelopment Agency* (1985), 171 Cal. App. 3d 95, 214 Cal. Rptr. 561; *First Federal Savings & Loan Association v. Board of Bank Control* (1974), 263 S.C. 59, 207 S.E.2d 801.

Admittedly, a few States have reached the opposite conclusion, *i.e.*, physical presence is required to constitute a quorum and take action (*State ex rel. Stephan v. Board of County Commissioners* (1994), 254 Kan. 456, 459, 866 P.2d 1024, 1026; *Roanoke City School Board v. Times-World Corp.* (1983), 226 Va. 185, 192, 307 S.E.2d 256, 259; *State v. Vermont Emergency Board* (1978), 136 Vt. 506, 508, 394 A.2d 1360, 1361-62), but only the *Stephan* decision was in the context of an open meetings act. In this case, we find the AG's opinion persuasive and hold the members of an administrative agency need not be in each other's physical presence to constitute a quorum.

When its comes to executing its official duties, an administrative agency is given discretion to accomplish its purpose. While it is a creature of statute, no specific statutory authority to conduct telephone conference meetings is required. (1982 Ill. Att'y Gen. Op. 124; see generally *Babac*, 531 Pa. 391, 613 A.2d 551; *Goode*, 143 Mich. App. 756, 373 N.W.2d 210; *Stockton Newspapers*, 171 Cal. App. 3d 95,

214 Cal. Rptr. 561; *First Federal*, 263 S.C. 59, 207 S.E.2d 801.) The Board has specific authority to conduct meetings which must comply with the Open Meetings Act, and that act does not prohibit telephone conferences.

The AG has stated telephone conferences do not conflict with the Open Meetings Act if conducted under the rules of the Board of Elections. There is no indication in the record whether the specific provisions for speakerphones required by the Board of Elections rules were used in this case, and Freedom argues the Board waived any authority it had to hold meetings by telephone conference by failing to adopt rules governing such meetings.

The Board argues Freedom's argument should be deemed waived because no authority is cited for the proposition failure to adopt rules waives an administrative agency's authority to act. Arguments unsupported by any legal authority are in violation of Supreme Court Rule 341(e)(7) (Official Reports Advance Sheet No. 26 (December 22, 1993), R. 341(e)(7), eff. February 1, 1994), and are found to be without merit (*Environmental Protection Agency v. Pollution Control Board* (1986), 115 Ill. 2d 65, 71, 503 N.E.2d 343, 346) or waived. (*Beneficial Development Corp. v. City of Highland Park* (1992), 239 Ill. App. 3d 414, 422-23, 606 N.E.2d 837, 844.) Whether waived or not, Freedom's argument is without merit.

The grant of statutory authority to an administrative agency does not always require the authority to be exercised through formal rule making and not every action taken without a formal rule is outside the legal authority of the agency. (*Illinois Federation of Teachers v. Board of Trustees* (1989), 191 Ill. App. 3d 769, 774, 548 N.E.2d 64, 67.) Further, statutory authority to promulgate rules does not mandate rules be adopted to cover every conceivable issue. See *Strube v. Pollution Control Board* (1993), 242 Ill. App. 3d 822, 829, 610 N.E.2d 717, 722.

In this case, the Board has adopted rules for the conduct of its public meetings specifying notice requirements, provisions for special and emergency meetings, record-keeping requirements and the number of votes of members necessary to constitute official action. (35 Ill. Adm. Code § 101.180 (1992-93).) Although the rules do not contain any reference to the conduct of meetings by telephone, the absence of a rule does not render the Board's authority to conduct meetings by telephone conference invalid. While the AG's opinion refers to the propriety of telephone conferences conducted in accordance with the rules adopted by the Board of Elections, the thrust of the opinion was concerned not with the fact rules had been promulgated but that the actual procedures followed were consistent with the Open Meetings Act.

In this case, the Board met pursuant to its authority under its rules to correct a clerical error in its decision. (35 Ill. Adm. Code § 101.301 (1992-93).) Public notice of the special meeting and its purpose was posted as required by rule. (35 Ill. Adm. Code § 101.180(b) (1992-93).) In addition, personal notice was given to Freedom. Minutes were kept of the meeting reflecting the roll call and participation of the Board's members and the votes of the members on the adoption of the supplemental opinion and order, also as required by rule. (35 Ill. Adm. Code § 101.180(c) (1992-93).) Freedom does not argue the procedures used to conduct the telephone conference were improper, nor does it allege it suffered any prejudice by the failure of the Board to adopt formal procedures for conducting such meetings. There is no allegation Freedom's representatives made any attempt to attend the meeting at the location where all the Board's members would have been required to be physically present, nor was there an allegation Freedom's representatives were unable to hear the telephone conference.

The absence of previously promulgated rules does not deprive the Board of its authority to conduct some meetings by telephone conference. No prejudice to Freedom was argued nor was any indicated in the record. However, if the Board intends to conduct some meetings by telephone conference in the future, better practice would dictate it should have rules in place for the procedures to be followed. Further, by our comments today we express no opinion on whether the Board's inherent authority to conduct some meetings by telephone conference would permit the Board to conduct all of its meetings by telephone conference.

For the foregoing reasons, the opinion and order of the Board is affirmed.

Affirmed.

COOK and GREEN, JJ., concur.