EMERGENCY TREATMENT, S.C., Plaintiff-Appellant, v. THE DEPARTMENT OF EMPLOYMENT SECURITY *et al*., Defendants-Appellees.

First District (3rd Division)    No. 1—08—1437

Opinion filed September 30, 2009.

Thomas A. Jefson and John J. Pembroke, both of John J. Pembroke & Associates, LLC, of Park Ridge, for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Paul Racette, Assistant Attorney General, of counsel), for appellees.

PRESIDING JUSTICE MURPHY delivered the opinion of the court:

On May 16, 2008, the trial court issued judgment affirming the decision of the Director (Director) of the Illinois Department of Employment Security (IDES) that plaintiff, Emergency Treatment, S.C., was required to pay unpaid employer contributions pursuant to the Illinois Unemployment Insurance Act (Act) (820 ILCS 405/100 *et seq.* (West 2006)). The Director concluded that certain individuals were employees of plaintiff. Therefore, plaintiff was responsible for contributions owed under the Act associated with wages it paid during the four calendar quarters of 2000. The trial court also rejected plaintiff's claim that the decision violated its due process rights. Plaintiff timely appealed and asserts that the Director's final administrative decision was clearly erroneous in finding that the physicians contracted by plaintiff, plaintiff's scheduler, and plaintiff's auditor were employees and not independent contractors. Plaintiff also asserts that the administration of the Act violates due process. For the following reasons, we affirm the Director's decision.

## I. BACKGROUND

Plaintiff is an Illinois corporation with offices located at 2142 North Sedgwick Street, Chicago, Illinois. During the calendar year 2000, plaintiff had an exclusive contract with Rush Copley Medical Center (Copley) in Aurora, Illinois, to provide physicians to staff the Copley emergency room. Following a random audit of plaintiff's taxable wages and contributions made during the 2000 tax year, IDES field auditor Mary Thompson determined plaintiff's liability for unemployment insurance contributions exceeded its payments remitted. IDES issued a "Notice of Determination and Assessment and Demand for Payment" to plaintiff on July 26, 2001. IDES demanded the payment of $562.62 for unpaid contributions and $107.84 for statutory interest on that amount, for a total of $670.46.

On August 15, 2001, plaintiff filed a written protest and petition for hearing to determine if the contracted physicians, scheduler and auditor for plaintiff were employees under the Act. A hearing was held on the matter and presided over by the Director's representative, Joseph Nunes. At the hearing, testimony was presented by: the owner and president of plaintiff, Dr. Marshall B. Segal; the scheduler for plaintiff, Mary Deans-O'Claire; a contracted physician for plaintiff, Dr. Alan Rosenberg; the office manager for plaintiff, Rita Ryan; and IDES

field auditor Thompson. Additionally, both parties presented documentary evidence in support of their arguments.

### 1. Contract Between Plaintiff and Copley

On February 23, 1998, plaintiff and Copley entered into a six-year renewable contract for plaintiff to be the exclusive provider of physicians to staff its emergency room department. Under the contract, plaintiff was responsible for recruiting physicians, setting hourly compensation, and creating schedules in order to assure continuous coverage. These monthly schedules were to be submitted to Copley a month in advance to assure coverage.

Physicians contracted by plaintiff were to be qualified and licensed to practice medicine in Illinois as well as obtain medical staff membership in accordance with Copley's bylaws. Physicians' methods were not controlled by Copley. However, all physicians were subject to compliance with Copley's rules and auditing. In addition, plaintiff was required to cause each physician to comply with Copley's continuing education requirements and any applicable laws, rules, or regulations.

Copley was required to supply space to physicians as well as the supplies and support staff necessary to render emergency services. Additionally, Copley provided professional liability insurance to the physicians and indemnification to plaintiff to the limits of its policy. However, it did not include any physicians in its employee insurance or benefit plans or withhold payment of any income taxes. Copley also represented that it would not hire any physicians associated with plaintiff within 15 months of that relationship.

In addition, the contract named Rosenberg medical director of the emergency department. Specific responsibilities were laid out for the medical director and his relationship with Copley. Rosenberg was required to be accountable to Copley for nonmedical tasks and authorized to provide and implement a long list of services to Copley and its emergency department. Among the listed responsibilities, the medical director was to take part in staffing decisions, serve as liaison between physicians and Copley staff, and perform evaluations of nursing staff and emergency physicians.

### 2. Physician Contracts With Plaintiff

During the year 2000, 15 physicians were under contract to plaintiff. Each physician entered into the relationship with plaintiff under plaintiff's form "Independent Contractor Agreement" (Agreement) for automatically renewable one-year terms. The Agreement stated that it was expressly understood between the parties that the physician was to perform services as an independent contractor, not as an employee of plaintiff or Copley. However, the physician was to

comply with the terms of the contract between plaintiff and Copley. This included the completion and documentation of continuing medical education, maintaining medical staff privileges at Copley, and attending meetings and trainings held by plaintiff and Copley. The Agreement provides that, upon request, plaintiff would provide assistance in securing medical staff privileges. As noted above, the contract between plaintiff and Copley established several additional duties for the medical director, including oversight of the physician staff, serving as liaison between groups, and overseeing the peer-review process for physicians.

The Agreement provided that the physician could be terminated by plaintiff, with or without cause. Additionally, several specific circumstances were listed that would lead to termination. The physician was free to pursue employment outside of his or her responsibility with Copley; however, the Agreement required prior notice to plaintiff of such employment. The physician was obligated under the Agreement to give plaintiff first priority over any other commitments and the submission for approval by plaintiff allowed it to review the request to assure that the physician would continue to meet the contractual requirements. The physician was not permitted to provide continuing treatment at Copley, and if the physician's tenure with plaintiff ended, the Agreement barred employment with Copley for three years after the term of the Agreement.

Attached to the Agreement was an 11-page document detailing the scheduling principles and guidelines. The physician was granted discretion in completing schedule requests that were filled out monthly and faxed to the scheduler. However, under the Agreement, the scheduler was charged with creating the schedule and granting time off based as closely as possible to submitted requests.

The physician was required to submit monthly time sheets to plaintiff's auditor. After the auditor reviewed time sheets, the physician was paid on the fifteenth of the month after services were rendered. The physician maintained responsibility to pay all applicable taxes and contributions. Under the Agreement, the physician was to earn a professional fee of $123 an hour. The physician could earn a $2-an-hour bonus for providing 2,000 hours of service and plaintiff would provide an annual federal tax statement Form 1099 or the equivalent. A $100 "scheduling coordinator fee" could be earned for picking up a shift at the request of the scheduler after the monthly schedule had been completed. Plaintiff did not provide any workers' compensation, retirement benefits, vacation or sick pay, personal leave, holidays or insurance benefits.

### 3. Administrative Hearing

At the administrative hearing, testimony was presented regarding plaintiff's operations and the duties and responsibilities of the scheduler, auditor, and physicians. The testimony explained the provisions of the Agreement outlined above. Testimony was provided that several physicians maintained employment at other hospitals during the pendency of their contracts with plaintiff. While the Agreement grants plaintiff the authority to discharge a physician at will, testimony indicated that it could not terminate a physician mid-month. However, Copley could effectively do so at any time by revoking medical privileges to that physician.

Extensive testimony was presented regarding the scheduler. The scheduler did not have a contract and worked under an at-will arrangement for a monthly fee of $3,333. The scheduler worked out of her home and was allowed to work for other employers. During 2000, the scheduler worked both as a travel agent and as a scheduler for a separate group of physicians. While the scheduler set up her own home office, plaintiff provided her a separate phone line and answering service. Plaintiff also reimbursed her for office expenses such as photocopies, messenger services, and postage.

The scheduler was trained by her predecessor and she trained another woman herself in case she was required to be away for a period of time. As noted above, the scheduler was to be available to physicians that needed assistance to assure all shifts were covered for emergencies or other unanticipated reasons. Testimony indicated that, although it was never necessary, plaintiff's president, Dr. Segal, was available as a last resort substitute in case a shift could not be covered. The scheduler testified that physicians were cooperative and scheduling usually ran smoothly.

The auditor did not testify and limited evidence was provided regarding her duties and activities. The auditor worked part-time for plaintiff out of her home. At the end of a month, the physicians would submit completed time sheets. It was the auditor's responsibility to check the time sheets for conformance with the monthly schedule for accuracy. When completed, the auditor would submit her approval of the time sheets to plaintiff's office manager and payroll checks were then cut.

### 4. First Recommended Decision and the Decision of the Director

On April 19, 2002, Nunes issued his recommended decision, including a detailed recitation of the facts and his analysis. First, Nunes concluded that the field auditor's report erred in concluding that two physicians did not provide services for plaintiff. Additionally, although

the field auditor determined that four physicians operated under a professional corporation and, therefore, plaintiff was not required to pay unemployment contributions on those wages, evidence indicated three of those corporations had been involuntarily dissolved prior to 2000.

Nunes stated that simply labeling an individual an independent contractor does not define whether an employment relationship exists. He concluded that plaintiff failed to meet its burden of establishing that the physicians, scheduler and auditor were independent contractors under any of the three requirements of the independent contractor exclusion of section 212 of the Act (820 ILCS 405/212 (West 2006)). Specifically, section 212 requires the employing unit to prove: that the individuals in question were free from its control or direction; that any of the individuals provided services outside the usual course of plaintiff's business or outside of the places of business of plaintiff; and that the individual is engaged in an independently established trade, occupation, profession or business.

Nunes concluded that plaintiff set specific rules for all of the positions, which, for physicians, were contained in their signed Agreement. Plaintiff set the schedule for all physicians and they were required to follow that schedule as well as attend various meetings and trainings as provided by the Agreement. The scheduler was required to be on call 24 hours a day. Nunes also found it important that plaintiff retained the right to discharge these individuals at will. Therefore, he found that the individuals were not free from plaintiff's control or direction.

Nunes also concluded that plaintiff failed to prove that it met the second factor. Plaintiff's business is the recruitment and supply of emergency room physicians for Copley. Accordingly, Nunes concluded that the physicians' performance at a location (Copley) and at a time set by plaintiff were essential to plaintiff's business and in the usual course of its business. Likewise, the scheduler and auditor performed duties essential to plaintiff's business. Nunes stated that the fact these two worked from their homes was insufficient to show compliance with this factor.

Nunes finally concluded that plaintiff also failed to establish that the individuals were engaged in an independently established trade, occupation, profession or business. While the physicians were all licensed and specially trained, each provided only his or her labor for the contractually set hourly wage. Plaintiff set the pay rate, established the relationship with Copley, and paid for the scheduler and auditor and all expenses required for its operation. Nunes opined that no evidence was presented to indicate any of the parties had an

independently established business performing the same services. While many performed similar services outside of Copley and could leave and work elsewhere, Nunes concluded that they would likely encounter a similar organization running the emergency room at any other hospital.

Under this conclusion, Nunes determined that all but one physician operating under a current corporation were employees of plaintiff. Therefore, he opined that plaintiff was correctly ordered to pay unemployment contributions for the year in question. However, Nunes modified the field auditor's calculation of contributions due upward because of her failure to include the physicians with dissolved corporations.

Plaintiff filed objections to the recommended decision and the Director issued her first decision on July 21, 2003. The Director outlined plaintiff's objections that Nunes should not have modified the original assessment to add additional payments for physicians not listed in the original determination by the field auditor. The Director remanded the matter to give plaintiff the opportunity to present evidence concerning the status of services provided by these physicians.

### 5. Additional Hearings, Recommended Decisions and the Final Administrative Decision

On June 14, 2004, a hearing on remand was conducted by director's representative Ronald S. Rodgers. Rodgers found that plaintiff presented no evidence to support a finding that the physicians performed services for plaintiff in their corporate capacities. Accordingly, on June 28, 2004, he recommended an additional modification to the original determination and assessment. Plaintiff filed objections to the second amended decision on July 28, 2004, and on April 11, 2006, the Director issued her decision.

The Director agreed with her representative that plaintiff failed to prove that the physicians, scheduler or auditor operated as an independent contractor and not an employee. The Director specifically laid out her agreement with the representative's conclusions regarding each of the three factors under section 212 of the Act. However, the Director disagreed that the four physicians were not properly operating under a corporate name. Accordingly, the Director deleted the wages to these physicians and remanded the matter for a final calculation of wages and contributions owed.

Pursuant to the Director's remand, Rodgers issued a third recommended decision on April 12, 2006. Plaintiff again objected and moved to dismiss. On July 13, 2006, the Director issued her final administra-

tive decision that the physicians contracted by plaintiff, plaintiff's scheduler, and plaintiff's auditor were employees and not independent contractors and plaintiff owed unpaid contributions of $670.62 plus interest. Plaintiff filed an action for administrative review and on May 16, 2008, the trial court held that the Director's decision was not clearly erroneous and that the Act did not violate plaintiff's due process rights. This appeal followed.

## II. ANALYSIS

Plaintiff asserts that the administration of the Act violates the due process clauses of the constitutions of the United States and Illinois. Plaintiff alleges that the Director possesses a pecuniary interest in the outcome of administrative hearings because her decisions directly impact the funding of IDES. Accordingly, plaintiff argues that the Director's adjudicative role in matters such as the instant hearing is improper as she is not an impartial decision-maker. Plaintiff asserts that the statutory process is fundamentally flawed under both constitutions.

Plaintiff also contends that the Director's conclusions in her final administrative decision were clearly erroneous. Plaintiff contends that this court should find that the physicians, auditor and scheduler were all independent contractors and reverse the decision of the Director. We first consider plaintiff's challenge of the Director's final administrative decision because a reviewing court will decide a constitutional question only where it is essential to the disposition of a case. *In re Application of the County Collector*, 132 Ill. 2d 64, 73 (1989).

### A. The Final Administrative Decision

In an action under the Administrative Review Law, factual determinations by an administrative agency are held to be *prima facie* true and correct and will stand unless contrary to the manifest weight of the evidence. 735 ILCS 5/3—110 (West 2004); *Amigo's Inn, Inc. v. License Appeal Comm'n*, 354 Ill. App. 3d 959, 964 (2004). We review the decision of the agency, not the circuit court, as the hearing officer is the fact finder responsible for overseeing testimony, making credibility determinations and assigning weight to statements made by witnesses. *Ahmad v. Board of Education*, 365 Ill. App. 3d 155, 162 (2006). However, questions of law are subject to *de novo* review. *Enesco Corp. v. Doherty*, 314 Ill. App. 3d 123, 131 (2000). The question of whether the Director correctly considered all the facts and correctly applied the law to determine an employment issue is a mixed question of fact and law, and the Director's final decision will be overturned only if clearly erroneous. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998).

■ Section 206 of the Act defines employment as "any service *** performed by an individual for an employment unit." 820 ILCS 405/ 206 (West 2006). Under section 204 of the Act, an employing unit is an entity which has in its employ one or more individuals performing services for it, as is the case for plaintiff. 820 ILCS 405/204 (West 2006). As noted above, an exclusion to the employment definition is set forth in section 212 of the Act, which provides in its entirety:

> "Service performed by an individual for an employing unit, whether or not such individual employs others in connection with the performance of such services, shall be deemed to be employment unless and until it is proven in any proceeding where such issue is involved that—
>
> A. Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and
>
> B. Such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
>
> C. Such individual is engaged in an independently established trade, occupation, profession, or business." 820 ILCS 405/212 (West 2006).

All three conditions of section 212 must be satisfied for the independent contract exclusion to apply. *SMRJ, Inc. v. Russell*, 378 Ill. App. 3d 563, 573 (2007). The burden rests on the employer claiming the exclusion to prove all three conditions, and if one condition is not met, our review may end. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 397 (2001). The Act is an act for the public welfare; thus, it is to be liberally construed in favor of inclusion. *AFM*, 198 Ill. 2d at 398. The language and understanding of the relationship by the parties are not controlling; rather, the determination must be based on the actual facts as applied to the conditions of section 212. *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security*, 201 Ill. 2d 351, 355 (2002).

As noted above, the Director determined that plaintiff failed to establish any of the conditions of section 212. We agree with the Director. However, under *AFM*, it is not necessary for us to consider all three conditions of section 212 if the employer was unable to satisfy one of the conditions. Accordingly, we will address plaintiff's failure to satisfy the second condition. Section 212(B) contains two alternative factors and proof of either will satisfy this section. *Carpetland*, 201 Ill. 2d at 383-84. IDES' rules and regulations provide the following for guidance:

"The two factors in Section 212(B) are in the alternative. Section 212(B) is satisfied if the service is either outside the usual course of business of the employing unit or performed outside of all the places of business of the employing unit:

1) Services which merely render the place of business more pleasant or are not necessary to the employing unit's business are outside the usual course of business.

Example: The services of a window washer engaged by an employing unit whose business is selling woolens are outside the usual course of the business of the employing unit.

2) Because services are performed outside the employing unit's premises does not preclude an individual from being found to be in employment. This decision is based upon the occupation and the factual context in which the services are performed.

A) Example: The homes of typists who are typing manuscripts for an employing unit are places of business of the employing unit.

B) Example: Any territory in which a salesman represents his employing unit's interest is the employing unit's place of business." 56 Ill. Adm. Code §2732.200(f), added at 14 Ill. Reg. 677-78, eff. January 2, 1990.

The first example listed above is derived from *Schatz, Pollack Woolen Co. v. Murphy*, 384 Ill. 218, 221 (1943). In that case, the employer was in the business of selling woolen goods as a jobber to the tailoring trade and it contested the determination that a window washer was an employee and not an independent contractor. The window washer owned all of his tools and submitted bills each time he completed a job. Our supreme court found that the washing of windows was not a part of the ordinary business of selling woolens, and while it made the business place more pleasant, it did not enter into the activities necessary to sell woolens. *Murphy*, 384 Ill. at 221. The *Carpetland* court discussed *Murphy* and stated that the focus of this review is not on whether the services are habitually, customarily, or routinely provided, but that they are necessary to the business of the employer and not incidental. *Carpetland*, 201 Ill. 2d at 386.

Plaintiff argues that the Director ignored the business reality in this case and the cases cited are distinguishable. Plaintiff notes that the cases considered all involve nonprofessional, contracted workers such as day laborers, delivery drivers, couriers, data entry workers, and carpet installers and measurers. Plaintiff contends that ample evidence exists that "these highly-trained, licensed, and highly compensated professionals act on their own accord and voluntarily choose to be treated as independent contractors for their own benefit."

Plaintiff admittedly concentrates almost the entirety of its argument on the second factor of section 212(B). However, it argues that it only supplies physicians to hospital emergency rooms and is not qualified to render medical services; thus it is not in the business of providing emergency room care. First, plaintiff's argument that the physicians are professionals who chose to be independent contractors need not be considered. This argument plainly violates the established rule stated in *Carpetland* that the facts of record and not the language or understanding of the parties is controlling in determining if the independent contractor exception applies. As for the first factor, contrary to plaintiff's assertion, the evidence indicates that plaintiff not only supplies physicians to hospital emergency rooms but creates a schedule and has established protocol to assure that there is continual physician coverage and that the physicians are properly compensated.

The services of the physicians, scheduler and auditor are all necessary components of plaintiff's business. Without these parties, there would be no business. The physicians' services are obviously an integral part of plaintiff's business of providing continual emergency room staffing. The scheduler is required to create a schedule for plaintiff to meet its contractual obligations. The auditor is required to assure the physicians are compensated properly. As the Director argues, plaintiff is not a headhunter simply placing employees, but under the contract with Copley and the terms of the Agreement, plaintiff is continually involved to assure constant coverage. The services of all of these individuals is necessary to assure this continued relationship and not an incidental service.

With respect to the second factor, plaintiff highlights that plaintiff's primary place of business is 2142 North Sedgwick Street, Chicago, Illinois, and none of the individuals at issue were required to report to that location or perform services there. Plaintiff cites to *Carpetland* and *Eutectic Welding Alloys Corp. v. Rauch*, 1 Ill. 2d 328 (1953), in support of its argument. In *Eutectic*, the employer was a New York corporation in the business of manufacturing and distributing welding rods and fluxes, sold in Illinois by sales representatives designated as "field engineers." *Eutectic*, 1 Ill. 2d at 330. The field engineers operated under a written contract and served a distinct territory. The *Eutectic* court found that soliciting orders was certainly within the course of the employer's business and that the assignment to a certain geographic area was the employer's place of business. *Eutectic*, 1 Ill. 2d at 340-41. This was further supported by the employer's lack of any office or center of business in the area. *Eutectic*, 1 Ill. 2d at 341.

In *Carpetland,* our supreme court examined this issue as applied to measurers and installers of carpeting contracted by Carpetland U.S.A., a retailer of floor coverings. First, the court found that the installers operated outside the employing unit's usual course of business because it had chosen to expressly limit its business to retail sale of coverings and installation was a wholly separate transaction for the consumer. Therefore, the installers were determined to meet the independent contractor exception. *Carpetland,* 201 Ill. 2d at 386-87.

Unlike in *Eutectic,* the measurers were not assigned a distinct sales territory. Rather, the measurer traveled to the home of a customer to obtain measurements to properly quote a price and close a sale. This task could only be completed in the customer's home, but could be completed by the customer, the salesperson or a measurer. Therefore, this assigned task and the ability to delegate the task indicated it was within the course of Carpetland U.S.A.'s business. The court also opined that the measurers represented Carpetland U.S.A.'s interest when visiting the homes of customers and thus, they provided services at the employing unit's place of business. *Carpetland,* 201 Ill. 2d at 388-91.

Plaintiff argues that the physicians were not assigned a specific area to sell a product, but only worked at Copley, which is not plaintiff's home office. Plaintiff asserts that the physicians are contracted solely to provide services to the patients at Copley's emergency room. Likewise, plaintiff points out that neither the scheduler nor the auditor was assigned any specific region, but worked solely from his or her home office. Accordingly, plaintiff concludes that unlike in *Carpetland* and *Eutectic,* none of the individuals were sent to Copley or their homes to represent plaintiff's interests, but simply contracted to complete services.

■ We agree with the Director that *Carpetland* and *Eutectic* support her decision on the second factor. The Director responds that the physicians are contracted to provide services to Copley for plaintiff. She argues that, though not a requirement, the fact that the physicians are assigned to work within Copley's emergency room, they are assigned to an area much narrower than a sales territory. Under *Carpetland,* the customer's homes were determined to be the employing unit's place of business because that place is where the employing unit's interests are being represented. Likewise, Copley is plaintiff's place of business as plaintiff is the exclusive provider of emergency room physicians and any lapse in coverage or improper care provided by physicians could lead to Copley's termination of the contract with plaintiff.

With respect to the scheduler and auditor who worked from home, both of these individuals provided essential documentation for plaintiff's continued operation. Similar to the manuscript typists in the administrative rule, these two individuals work from home. While testimony, evidence and argument regarding the auditor are limited at best, the evidence showed that plaintiff paid the scheduler's office expenses and set up a separate phone line and voice mail service for her work as scheduler. The preparation and maintenance of the schedule and the auditing of time sheets are clearly within plaintiff's course of business and completed to represent plaintiff's interest. As with the manuscript typist, the fact these activities occur from a remote office is not dispositive and the decision of the Director was not clearly erroneous.

### B. Administration of the Illinois Unemployment Insurance Act

As addressed above, this court will not entertain a constitutional challenge of a statute unless necessary to the resolution of a case. Since we have rejected plaintiff's challenge to the Director's decision, we now consider the challenge to the Act. We note that the Act and the provisions relating to investigations, hearings and decisions have been considered and found constitutional by this court. *Cullerton v. Crawford*, 80 Ill. App. 2d 237 (1967). However, plaintiff has advanced a broad facial attack on the hearing process established by the Act as violating due process based on a different issue—the Director's budgetary interests. This type of challenge was raised before our supreme court in *Carpetland*; however, the court determined that the plaintiff waived the issue for failing to raise it during the administrative hearing.

The plaintiff in *Carpetland* argued before the circuit court that "the Director had 'a direct, proximate, and definite pecuniary interest in the outcome of the proceeding.' " *Carpetland*, 201 Ill. 2d at 396. Although the issue was raised before this court, we did not reach that issue in reaching our decision. *Carpetland*, 201 Ill. 2d at 396. Our supreme court, noting that an agency has no authority to invalidate a statute as unconstitutional or question the statute's validity, found the argument waived. The court opined that it would not serve justice to consider the issue on the ground that administrative review is limited to the record before the tribunal and considering the issue without allowing the opponent a full opportunity to refute the challenge. *Carpetland*, 201 Ill. 2d at 397. The court went on to note that waiver is a limitation on the parties and not the court's jurisdiction, but that case did not warrant relaxing the doctrine of waiver to serve the interests of justice. *Carpetland*, 201 Ill. 2d at 397.

■ In this case, plaintiff did not raise the facial attack on the statute before the Director's representative, but only argued that the decision to add individuals to the determination of contributions owed violated its due process rights. However, in plaintiff's appeal to the circuit court, the Director did not raise the waiver argument, but extensively briefed this issue. The Director included extensive documentation regarding the General Assembly's appropriations to IDES and the statutory limitations to the Director's control over the budget and the court accepted that argument. While the Director does not present a similarly thorough treatment of this issue on appeal, she again failed to raise the waiver argument.

Accordingly, while the *Carpetland* court stated that it is advisable to assert a constitutional challenge before the administrative tribunal, it left the door open for relaxation of the waiver doctrine if the interests of justice merit this court's review. We consider this an important issue as it potentially affects a number of agencies and administrative hearings and a decision would assist in the efficiency and certainty of those proceedings. We review a challenge to the constitutionality of a statute *de novo. Morgan v. Department of Financial & Professional Regulation*, 374 Ill. App. 3d 275, 292 (2007). Our analysis starts with a presumption that the statute is constitutional and the burden rests on the party challenging the statute to clearly establish that it is unconstitutional. *Morgan*, 374 Ill. App. 3d at 292.

Plaintiff notes that it is well settled that due process requires a fair trial in a fair tribunal and that this extends to administrative hearings. *Bethlehem Steel Corp. v. United States Environmental Protection Agency*, 638 F.2d 994, 1008-09 (7th Cir. 1980). If the decision-maker is biased, there can be no impartial hearing and the process is constitutionally impermissible—even if the agency's procedures and rules are acceptable. *Bethlehem Steel*, 638 F.2d at 1009. Plaintiff argues that if the Director has a pecuniary interest either personally or for the operation of the agency, the due process clause is violated. *Ward v. Village of Monroeville*, 409 U.S. 57, 60, 34 L. Ed. 2d 267, 270-71, 93 S. Ct. 80, 83 (1972). However, plaintiff must overcome the presumption of honesty and integrity of those serving as adjudicator for an agency and provide sufficient proof that the risk of unfairness is "intolerably high." *Bethlehem Steel*, 638 F.2d at 1009.

In *Ward*, following a municipal hearing presided over by the mayor of Monroeville, Ohio, the petitioner was convicted of traffic offenses and fined by the mayor. The petitioner appealed his conviction, arguing that the mayor's responsibilities for both revenue production and law enforcement denied him a fair trial before an impartial judicial of-

ficer. Evidence was presented that indicated that a "substantial portion of the municipality's funds" was derived from the fines, forfeitures, costs, and fees levied by the mayor. *Ward*, 409 U.S. at 59, 34 L. Ed. 2d at 270, 93 S. Ct. at 82.

The Supreme Court examined whether this rendered the tribunal, authorized by state statute, unconstitutional. The Court stated that the test is not whether the executive and judicial powers are merged, but whether the situation presented "is one 'which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused.' " *Ward*, 409 U.S. at 60, 34 L. Ed. 2d at 271, 93 S. Ct. at 83, quoting *Tumey v. Ohio*, 273 U.S. 510, 532, 71 L. Ed. 749, 758, 47 S. Ct. 437, 444 (1927). The Court concluded that the mayor's executive responsibility for the village's finances and the temptation to maintain a high level of funds presented a seriously inconsistent position with his judicial responsibilities and rendered the proceedings constitutionally infirm. *Ward*, 409 U.S. at 60, 34 L. Ed. 2d at 271, 93 S. Ct. at 83.

Plaintiff adds that the finding in *Ward* has been expanded in subsequent rulings by the Supreme Court and the Seventh Circuit Court of Appeals. In *Gibson v. Berryhill*, 411 U.S. 564, 579, 36 L. Ed. 2d 488, 500, 93 S. Ct. 1689, 1698 (1973), the Supreme Court found that the disqualifying substantial pecuniary interest in a judicial proceeding need not be direct or positive. In *Gibson*, the state board of optometrists responsible for overseeing the licensing of optometrists was comprised entirely of optometrists in private practice. The board issued a decision revoking the licenses of optometrists that were employed by business corporations and not in private practice. The Supreme Court held that the decision was invalid because the result of the decision would possibly redound to the personal benefit of the board in the form of increased business for private optometry practices. *Gibson*, 411 U.S. at 578-79, 36 L. Ed. 2d at 500, 93 S. Ct. at 1698.

The Seventh Circuit later followed *Gibson* in finding that the defendant medical commission's statutory power to conduct hearings concerning the use of land within a district under its control was constitutionally impermissible. The issue of whether the use of the land was proper carried the possibility of reverter of the property back to the commission. Because the commission would have benefitted by receiving title to the land—without cost to the commission—the hearing was constitutionally impermissible. *United Church of the Medical Center v. Medical Center Comm'n*, 689 F.2d 693, 698-99 (7th Cir. 1982).

Plaintiff contends that under these cases, the Director's responsibilities under the Act, her administration of funds collected under the Act, and the appropriations by the General Assembly indicate that the Director has an impermissible pecuniary interest in generating funds. Plaintiff points out that under the Act, employers are required to make contributions to the Unemployment Trust Fund based upon wages paid to its employees. Employers are subject to pay interest and penalties for failure to make contributions or file a report of wages paid, with additional penalties for willfully failing to pay contributions. See 820 ILCS 405/1400 through 1402 (West 2006). Under section 2101 of the Act, the interest and penalties collected are to be deposited into a special administrative account to be utilized for specific reasons or the general proper administration of the Act if appropriated by the General Assembly. 820 ILCS 405/2101 (West 2006).

Citing to the appropriation bills for the year 2000 and years 2003 to 2007, plaintiff notes that the General Assembly appropriated $10 million or more each year from the special administration fund to be deposited directly into the Title III Social Security and Employment Fund. These amounts were then utilized to almost completely cover appropriations for all of IDES' expenses. Therefore, plaintiff argues that the special administration fund was the *de facto* source of funding for the Director's budget. As such, plaintiff asserts that the Director's interest in maintaining her budget superseded permissible limits and rendered proceedings unconstitutional.

Plaintiff adds that the Illinois Constitution also provides a guarantee of due process and affords no less protection than the United States Constitution. Plaintiff adds that Illinois courts may construe a similar constitutional provision differently than the Supreme Court and the constitution of Illinois may provide more protection. *People v. Hightower*, 172 Ill. App. 3d 678 (1988). It summarily concludes that based on its analysis above that the federal due process guarantee has been violated, it has also shown a violation of the Illinois constitution.

In response, the Director contends that plaintiff has not proven bias to overcome the assumption that administrators are assumed to be people of good conscience and intellectual discipline capable of fairly judging a controversy based on the merits. See *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 95 (1992); *SMRJ, Inc.*, 378 Ill. App. 3d at 571. As noted above, plaintiff has only presented a facial attack in it's appellant's brief, so we need not consider these arguments. Accordingly, we focus on the Director's succinct response to plaintiff's facial attack and reliance on *Ward* and *Gibson*.

The Director contends that plaintiff does not argue that her salary is contingent on the amount of funds collected as a result of appeal proceedings or that she has a personal interest in any proceedings as did the officials in *Gibson*. The Director further maintains that there is no impermissible pecuniary benefit when funds received benefit the community served as a whole as discussed in *Citizens Against Regional Landfill v. Pollution Control Board*, 255 Ill. App. 3d 903, 908 (1994). In *Citizens*, the county and landfill applicant entered into a contract that called for the applicant's payment of 50% of the county's legal fees for the landfill review process as allowed by the Illinois Environmental Protection Act. *Citizens*, 255 Ill. App. 3d at 908, citing 415 ILCS 5/39.2(k) (West 1992). Included in these fees was the salary of the hearing officer, a special assistant State's Attorney for the county, whom the plaintiffs alleged had contradicting duties that led to an unfair hearing. *Citizens*, 255 Ill. App. 3d at 907.

The court opined that there was no inherent conflict of interest in the hearing officer's duties and his role in service to the State's Attorney and the community. For support, the court noted that its conclusion was "supported by the principle that there is no inherent bias created when an administrative body is charged with both investigatory and adjudicatory functions." *Citizens*, 255 Ill. App. 3d at 908, citing *E&E Hauling v. Pollution Control Board*, 107 Ill. 2d 33 (1985); *Town of Ottawa v. Pollution Control Board*, 129 Ill. App. 3d 121 (1984). The court found that there was no evidence that the hearing officer's salary was contingent upon site approval and that the payments "were not a direct pecuniary benefit to any county employee, but rather to the community as a whole." *Citizens*, 255 Ill. App. 3d at 908. The Director contends that, as in this case, there was no conflict in her roles as director of the agency and her adjudicatory role of decision-maker. Furthermore, she contends that no evidence was presented to support that her salary was dependent on the outcome of administrative proceedings; therefore, she contends this court should follow the *Citizens* court in upholding her ruling.

Finally, the Director argues that, unlike *Ward*, where the majority of the village's budget was supported by fines imposed by the mayor in the municipal court, there is no indication or allegation that a significant portion of IDES' budget comes from the interest or fines recovered under the administrative process. The Director also highlights that the mayor in *Ward* had wide executive authority while the Director is only in charge of one agency and must report to the governor. *Cf. Coyne v. Milan Police Pension Board*, 347 Ill. App. 3d 713, 721-23 (2004) (*Ward* distinguishable where board member village clerk had only clerical duties with only remote connection to financial

policy). The Director concludes that plaintiff's position is untenable and illogical as the Director or any agency head would be biased against taxpayers because money collected goes either to the agency or the state. Furthermore, in the event of any suspected bias, the Director argues, plaintiff's, and any other taxpayer's, rights are protected by the judicial-review process.

■ We agree with the Director that the trial court properly concluded that the Act survives plaintiff's facial attack. First, we note that the Director's argument that plaintiff's rights are protected by the judicial-review process must fail. While this is an important provision in protecting the taxpayers' rights, such a safeguard cannot guarantee a fair trial and may not cure a statute that violates due process guarantees on its face. *Ward*, 409 U.S. at 62, 34 L. Ed. 2d at 272, 93 S. Ct. at 84 (White, J., dissenting, joined by Rehnquist, J.). In any event, the instant case is distinguishable from *Ward* and *Gibson* and the Act survives plaintiff's challenge.

Unlike the cases cited by plaintiff, the Director does not have expansive executive powers or receive a direct gain from decisions under the administrative process provided by the Act. Unlike *Ward*, the Director does not have ultimate authority. As noted by the Director, she must follow specific statutory provisions provided by the legislature and answer to the Governor. The sources and use of the IDES budget are specifically governed by statute and the General Assembly.

This is further evidenced by plaintiff's submission of appropriations bills. Unlike in *Ward* where the evidence indicated that the municipality's budget was significantly supported by fines levied by the mayor in the municipal court, there is no evidence here that the Director's decisions directly affect a substantial portion of IDES' multi-million dollar budget. Here, generally, IDES has a total budget of over $250 million and an operating budget of over $10 million. While plaintiff argues that the operating budget is mostly funded from the special administrative account, plaintiff has failed to show that IDES' administrative budget is in any way determined based on the amount of interest and penalties collected from employers for wilfully failing to pay contributions pursuant to sections 1400 through 1402 of the Act. 820 ILCS 405/1400 through 1402 (West 2006).

The final administrative decision in this case resulted in a determination of $670.62 unpaid contributions, plus interest were owed by plaintiff. Even if we were to aggregate all of the income derived from the interest and penalties imposed by the Director and IDES in all of the cases determined over the course of a year, as did the *Ward* court, this amount would equal only approximately 4% of

IDES' total annual budget. Following *Ward*, the evidence does not present a situation that the temptation was so much that the Director would ignore the burden of proof required.

This case more closely resembles the situation presented in *E&E Hauling*, which was cited approvingly by the *Citizens* court. That case involved the issue of a landfill expansion permit granted by the DuPage County Board. The pollution control board reversed the decision on the ground that the members of the county board were the same as the DuPage County Forest Preserve District (district), the owner of the land benefitting from the expansion of a landfill. *E&E Hauling*, 107 Ill. 2d at 37-38. With respect to the issue that the decision-maker had an interest in the permit application, our supreme court considered the holding in *Ward*. The court considered the fact that the district received an average monthly payment of $30,000 as a result of the permit. The court found that these payments were not a direct pecuniary benefit, but a benefit to the community served by the district. Furthermore, considering the annual budget of the district was $163.5 million, the annual payment of $360,000 for the permit was "obviously a different matter" than that presented by *Ward*. *E&E Hauling*, 107 Ill. 2d at 42. The court continued:

> "More fundamentally, the board should not be disqualified as a decision-maker simply because revenues were to be received by the county. County boards and other governmental agencies routinely make decisions that affect their revenues. They are public service bodies that must be deemed to have made decisions for the welfare of their governmental units and their constituents. Their members are subject to public disapproval; elected members can be turned out of office and appointed members replaced. Public officials should be considered to act without bias." *E&E Hauling*, 107 Ill. 2d at 42.

Applied to this case, simply because the Director ultimately presides over contribution disputes that affect revenues does not render the proceedings unconstitutional. There is no overwhelming need or proportional gain as in *Ward* that would lead us to find the risk of unfairness is "intolerably high" in this case. Similar to *E&E Hauling*, the scenario here is "obviously a different matter" when one considers the amount of funds recovered pursuant to sections 1400 through 1402 of the Act and IDES' annual total budget. Plaintiff's reliance on *Ward* is unavailing.

Next, while the benefit to the decision-maker need not be direct, the situation is distinguishable from *Gibson* where the members of the board were to receive the benefit of increased business at their practices based on their decision. The Director's decisions and the ef-

fect of contributions, interest and fines under the statutory scheme are not comparable to a personal business interest or an immediate benefit to the Director. Likewise, they are not so substantial as to allow an inference that they could affect decision-making like in *Ward*. Furthermore, the Director's salary is determined by the Governor by statute (20 ILCS 5/5—340 (West 2006)) and separately appropriated for by the General Assembly. Accordingly, no direct link to any personal interest can be derived from the Director's actions, unlike in *Gibson*.

The Director's role at IDES is more directly involved in agency decision-making and budgetary control than simply clerical responsibilities as in *Coyne*; however, her role does not rise so far as to present a constitutional infirmity in the process. Likewise, there was no evidence provided that her decisions interpreting the Act and IDES regulations in administrative hearings has any direct budgetary result so as to create such a temptation. Accordingly, plaintiff's facial attack of the Act as violating due process is rejected.

## III. CONCLUSION

For the aforementioned reasons, the decision of the Board is affirmed.

Affirmed.

QUINN and COLEMAN, JJ., concur.