29 A.3d 1019

**M. Hasip TUZEER, et al.**

v.

**YIM, LLC, et. al.**

**No. 816, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

Oct. 3, 2011.

J. Carroll Holzer (Holzer & Lee, on the brief), Towson, MD, for Appellant.

Herbert Burgunder & Sarah R. Gutman (George A. Nilson, City Solicitor, on the brief), Baltimore, MD, for Appellee.

Panel: GRAEFF, HOTTEN and JAMES A. KENNEY, III, (Retired, Specially Assigned), JJ.

GRAEFF, J.

This case involves the use of property as a restaurant in an area that, pursuant to current zoning regulations, does not permit restaurants. The property at 123–129 West 27th Street, Baltimore, Maryland (the "W. 27th Street property")

operated as a nonconforming use through May 2008. The owner of the W. 27th Street property, YIM, LLC ("YIM"), one of the appellees, sought a new permit for restaurant use in May 2009. In October 2009, the Baltimore City Board of Municipal and Zoning Appeals (the "Board"), the other appellee, permitted the continued nonconforming use of the W. 27th Street property as a restaurant. Mr. Hasip Tuzeer and other neighbors of the W. 27th Street property ("appellants"), appeal from the judgment of the Circuit Court for Baltimore City, which affirmed the Board's decision to allow the use of the property as a restaurant.

Appellants present several questions for our review,[1] which we have rephrased as follows:

1. Has there been a substantive change in the applicable law requiring reversal of the Board's decision?

2. Did the Board violate the Open Meetings Act?

3. Did the Board err in its finding that the nonconforming use at issue had not been discontinued?

4. Did the Board improperly modify the nonconforming use permit?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

---

**1.** The questions presented by appellants in their brief, although not phrased as questions, are as follows:

 1. The Board and Circuit Court must be reversed, when there has been a substantive change in the applicable law during the pendency of this matter.

 2. The Board and Circuit Court may not be affirmed, when the findings of fact and conclusions of law contained in the October 20, 2009 Resolution were not adopted in accordance with [Md.Code (2003 Repl.Vol.) Art. 66B] and the Open Meetings Act.

 3. The Board and Circuit Court may not be affirmed, when the finding of the Resolution that the nonconforming use at issue had not been "discontinued" contradicted the undisputed testimony and was unsupported by competent evidence.

 4. The Board and the Circuit Court may not be affirmed, when the October 20, 2009 Resolution unlawfully modified the prior nonconforming use of the first floor or a portion thereof, and created ambiguity as to the portion of the first floor to be authorized for "continued" use as a "restaurant."

## FACTUAL AND PROCEDURAL BACKGROUND

The W. 27th Street property consists of four row houses in Baltimore, Maryland that have been combined to form a single unit. The property was built in the 1940s, and YIM has owned it since November 2006.

When YIM purchased the property in November 2006, a bar named 1.7th Generation was operating there. It ultimately sold the business interest to Two Sisters Grille, LLC ("Two Sisters"), which operated as a restaurant and bar. A small bakery that prepares gluten free food used a separate area of the property, as well as a portion of the restaurant's kitchen space.[2]

Two Sisters closed at the end of May 2008. YIM then sought a new tenant to operate a restaurant. In December 2008, YIM leased the property to David Weishaus, and they began the process of procuring the proper permits to operate a restaurant with a liquor license.

That same month, December 2008, Two Sisters filed a Petition for Hardship Extension with the Baltimore City Board of Liquor Commissioners, requesting an extension of its liquor license to permit the transfer of the liquor license to the new restaurant operator for the W. 27th Street property. The Board of Liquor Commissioners granted the request, approving an extension for 180 days from December 11, 2008.

On May 11, 2009, YIM filed a Use and Occupancy Permit Application with the Department of Housing and Urban Development, requesting a permit for the W. 27th Street property to be used as a "lounge & restaurant open 7 days [each week], food and beer, wine, & liquor, first and second floors."

---

**2.** On February 20, 2007, the Board adopted a Resolution approving the use of the kitchen in the existing tavern at the W. 27th Street property for the preparation of baked goods, stating that the use of the kitchen was "accessory to the existing tavern." On February 20, 2008, referencing the 2007 action, the Baltimore City Department of Housing and Community Development approved the Use and Occupancy Permit application for a retail bakery. A Certificate of Occupancy was issued on May 21, 2008.

The record reflects that the permit application was initially given zoning approval that day and a draft permit was filed on May 21, 2009, but the permit subsequently was voided on June 4, 2009.[3]

On June 11, 2009, YIM filed an appeal to the Board. It requested that the Board approve the application for an extension/use of a non-conforming restaurant with a liquor license.

On June 15, 2009, after the initial permit application was voided, YIM filed a Use and Occupancy Permit Application with the Department of Housing and Community Development, seeking to "continue use and extend time limit for discontinuation for portion of 1st floor (restaurant with liquor license)." YIM's application was denied on June 15, 2009, and YIM filed an appeal to the Board.

On August 18, 2009, after several postponements, the Board held a hearing regarding YIM's request to use a portion of the first floor of the W. 27th Street property as a restaurant with a liquor license. Counsel for YIM noted that, according to City permit records, the W. 27th Street property has been used as a restaurant since at least 1961.[4]

Mr. Paul Goldberg, the principal of YIM, testified that a restaurant and/or bar had operated on the property since he purchased it in 2006. Two Sisters closed at the end of May

---

3. In a letter dated July 30, 2009, in response to a request by YIM's attorney, Mr. Geoffrey Veale, the Acting Zoning Administrator, explained the process related to the May 11, 2009, permit application. Because the application requested that the second floor of the W. 27th Street property be used as a tavern, and because the second floor had never been approved to operate a tavern, the application was determined to be a request for an expansion of a nonconforming use that would have to be approved by the Board. The letter further explained that the zoning office received a call from a community representative on June 4, 2009, advising that the tavern had lost its liquor license and that the use of the property as a tavern has been discontinued for more than 12 months. A staff member was advised to "tag" YIM's application "until the issue of the discontinuance of the nonconforming use was resolved," but the application "was inadvertently voided instead."

4. YIM submitted copies of these records as exhibits.

2008 after falling into arrears in its rent and tax payments. YIM immediately began to market the W. 27th Street property, eventually leasing the first floor space to David Weishaus in December 2008. Mr. Weishaus began making improvements, with the ultimate goal of operating a restaurant.

In May 2009, Mr. Goldberg learned that "there was a great rift between [Mr.] Weishaus and the community civic association." After determining that Mr. Weishaus would "not necessarily suit the interest of the community civic association," he and Mr. Weishaus agreed to break the lease. YIM approached Richard D'Souza, who had talked about "an expansion . . . of his bakery or as a sit down area." They entered into a lease, contingent on the ability to get a liquor license.

In April or May of 2009, Mr. Weishaus filed an application to transfer to Mr. D'Souza the liquor license he had procured. YIM advised the Charles Village Association that the restaurant would not play live music or host professional parties, and it would maintain the sidewalks and operate a clean facility.

Mr. Goldberg testified that the only economically feasible use for the W. 27th Street property is a restaurant. He explained that rental payments from a residence would not cover the amount it would cost to convert the first floor of the property to an apartment.

Mr. D'Souza, who operated a gluten-free bakery on one side of the W. 27th Street property, testified that he hoped to take over the space used as a restaurant. He wanted to establish a restaurant that would cater to gluten-free clients, although it would not be totally gluten-free.

A number of neighborhood residents were either present at the hearing or submitted letters to the Board regarding YIM's permit request. Residents stated that, for more than a year, the use of the property had been a bakery, and they expressed concern regarding the impact that a restaurant with a liquor license would have on the neighborhood and its residents, specifically concerns about crime, disorderly conduct, noise, and parking. Neighborhood representatives also testified,

echoing concerns related to the consumption of alcohol, crime, trash, and noise.

Michelle Wirzberger, on behalf of the Charles Village Association and the greater Remington Improvement Association, further argued that the W. 27th Street property falls within the boundaries of the Charles/25th Urban Renewal Plan, which prohibits a nonconforming use from being re-established when it has "been inactive and not in continuous operation for 12 months." She asserted that, if the Board did not agree with that argument, the Board needed to "ensure that in terms of allowing a continuation that the continuation is not contrary to the public interest," and she argued that permitting a restaurant with a liquor license to operate out of the W. 27th Street property was "contrary to the public interest" because it would cause parking problems and attract "bad actors and dangerous activity," including urination and defecation on neighboring properties.

Counsel for appellants argued that YIM's request constituted a request for a modification because, when the Board authorized "the kitchen in the tavern [to be used] for preparation of baked goods" in May 2007, it did not "grant a second separate principal use [of] the property"; the Board merely granted "an accessory use of the kitchen." Counsel argued that the current permit request sought a separate, distinct use, namely a restaurant with a liquor license. Authorizing the permit, he maintained, would result in two side-by-side commercial uses instead of a single non-conforming use, representing a modification of the non-conforming use. Counsel argued further that the non-conforming use as a restaurant had been abandoned, and that a restaurant with a liquor license was "not compatible with the surrounding neighborhood."

David Tanner, the Executive Director of the Board, then discussed the historical use of the W. 27th Street property. He stated that the property "started as single family homes in four separate lots," and "they were allowed to extend the first floor at 125 and 127 in conjunction with the tavern at 129 in

1946." He believed that the fourth unit was expanded into a bakery in 1961, but "it was all done prior to '71," when zoning restrictions were imposed.

Counsel for YIM then gave his closing argument. He maintained that operation of a restaurant/tavern on the property constituted a long-standing nonconforming use. Counsel noted that the property had operated as a restaurant with a liquor license until May 2008, when Two Sisters closed, and that a new use permit would have been issued in May 2009 if there had not been a mistake in the zoning office, which voided YIM's application instead of tagging it.

With respect to the argument that there had been a discontinuation of use as a restaurant, counsel made two points. First, he argued that the provisions of discontinuation and abandonment did not apply to the R–8 district. Second, he argued that, even if they did apply, there was no abandonment in this case because "the discontinuation of use was beyond the control of the owner." Counsel noted that YIM applied for a new Use and Occupancy Permit, "which, according to Mr. Veale, would have been issued but for a mistake in the zoning office which made the item—instead of flagging it for looking into it more, they voided the application," which Mr. Veale said was a mistake. He asserted that YIM "made all reasonable efforts to rent, lease or sell the ... property," arguing that "the enforcement of [a] time limit would impose exceptional practical difficulties that are not created by or as a result of any action or lack of action by the owner."

The Board subsequently issued a written Resolution, which stated that it had been adopted on September 15, 2009, permitting "the use of the property as a restaurant, subject to conditions[,] to continue." [5] The Resolution stated that "[r]estaurants, with or without liquor licenses, are not listed as permitted or conditional uses in the R–8 Residence District

---

**5.** The Resolution stated that the Board's decision related only to the request for restaurant use, and the issue of a liquor license would be addressed by the Board of Liquor License Commissioners for Baltimore City.

under Subsections 4–1101 and 4–1103." [6] It noted, however, that "[u]nder the provisions of Subsections 13–103(a) and 13–101, any lawfully existing non-conforming use or structure may be continued." [7]

The Resolution summarized the testimony. It noted the documentation demonstrating that the first floor of the W. 27th Street property had been used as a restaurant/bar since prior to 1961, and that the use had continued unabated until the end of May 2008, when Two Sisters closed. It stated that, in March 2009, a permit was issued to a new tenant to allow interior improvements, and in May 2009, a permit was issued to use the W. 27th Street property as a lounge/restaurant selling beer, wine, liquor and food on the first and second floors. The Zoning Administration Office voided the permit, however, because a community representative informed it that the nonconforming use had been discontinued for more than 12 months and that operations could not be expanded to the second floor.

The Resolution stated that the owner was seeking authorization to reestablish the use of the first floor as a restaurant, with Richard and Renee D'Souza as the proposed operators of the restaurant. It noted that YIM had submitted an affidavit from Tecaram Raghubar, "confirming that he had managed the restaurant from January 2009" through June 2009. [8]

---

**6.** Baltimore City Zoning Code ("BCZC") §§ 4–1101 and 4–1103 provide for the permitted and conditionally permitted use of property located in the R–8 zoning district. BCZC § 4–1101 permits property to be used for single-family and multiple-family attached and detached dwellings, educational, day-care, recreational and religious facilities, non-profit clubs and lodges, and hospitals. BCZC § 4–1103 permits property in the R–8 zoning district to be used, upon the Board's approval, for bed and breakfast establishments, fraternity and sorority houses, rooming houses, and physicians' and dentists' professional offices.

**7.** As applicable to this matter, BCZC § 13–101(c) defines nonconforming use as "any lawfully existing use of a structure or of land that does not conform to the applicable use regulations of the district in which it is located."

**8.** Mr. Raghubar stated in an affidavit dated August 14, 2009, that he "was a manager at the Reserve Restaurant located at 127 W. 27th

The Board proceeded to make the following findings:

The Board finds that this property has been a facility serving food to the public, primarily for on premises consumption by seated patrons for many years. For example[,] in 1956 the Board authorized the use of the second floor of 123–129 W[.] 27th Street for a dining room for the restaurant. The Board also notes that the second floor was last authorized as two dwelling units and is not included in this appeal. There have been a number of permits issued over the years where the use of the first floor has been described as a restaurant or as a tavern. The appellant testified that the facility has always served food. The Board finds that since 1971 until 2004 taverns and restaurants with liquor licenses were considered the same under the Zoning Code. Both were allowed to serve food and were undefined in the code and were permitted in the same zoning districts. The bulk regulations, off-street parking and sign regulations were and continue to be applied equally. In 2004[,] the Mayor and City Council amended the Zoning Code by enacting Ordinance 04–831 LIVE ENTERTAINMENT—NIGHTLIFE for the purpose of defining certain terms relating to restaurants, taverns, halls, after hour establishments, and certain other establishments that serve food or beverages, that offer live entertainment. This amendment became effective December 29, 2004.

\* \* \*

Street," he "personally was present in April, May, and June 2009, when specific events were hosted at 127 W. 27th Street, Baltimore, Maryland at the Reserve Restaurant," that when he "took possession of the establishment in January 2009," the facility was equipped with all appliances and furniture necessary for a restaurant, and that "[s]ales taxes and appropriate operating fees were paid to the city."

Mr. Tuzeer filed with the Board a motion to strike Mr. Raghubar's affidavit from the Board's Resolution and exhibits because it was not "discussed at the hearing on August 18, 2009," nor was it "presented for [his] review or response." He alleged further that the affidavit and exhibits contradicted YIM's Memorandum of Law submitted at the hearing. The record does not include a response by the Board to this motion.

The Board finds that based on the evidence presented at the hearing the first floor was operating as a restaurant until at least May 31, 2008[,] when the prior tenant, Two Sisters Grille, LLC closed. On March 6, 2009[,] a permit was issued to the owner for interior improvements. On May 11, 2009[,] a permit application was approved in the Office of the Zoning Administrator to use the premises as a "Lounge/restaurant selling beer, wine, liquor and food on [the] 1st and 2nd floor[s]". This application was voided by the Zoning Administration because it authorize[d] the second floor as part of the establishment in error and the community was expressing concern about the continued use of the first floor. The owner then filed this appeal to the Board.

After setting forth the evidence that had been presented, the Resolution then set forth the Board's conclusions:

The Board finds that the use of this property as a restaurant, subject to conditions can continue. The use had not been discontinued or abandoned as required under Section 13–407 o[f] the [C]ode and even if the evidence confirmed that it had been discontinued subsection 13–407(c) would apply which excepts Class III nonconforming uses in [the R–8–] District[ ]. The Board finds that while this application states that the request is to continue the use for a restaurant with a liquor license the Board decision relates to the restaurant use only. Questions or procedures concerning any liquor license should be addressed to the Board of Liquor License Commissioners for Baltimore City.

The Board imposed restrictions on the hours of operation, ordering that the restaurant be closed no later than 10:00 p.m. on week nights and no later than midnight on Friday and Saturday nights.

On November 17, 2009, YIM filed a Petition for Judicial Review in the Circuit Court for Baltimore City, asserting that the Board "erred in applying time restrictions to a nonconforming use." Mr. Tuzeer subsequently filed a Petition for Judicial Review, arguing that the Board's approval of the

nonconforming restaurant use should not be affirmed because: (1) it constituted an impermissible modification of a nonconforming use; (2) the Board's Resolution was not adequately supported by the record and referred to evidence that was not part of the proceeding; and (3) the Board did not comply with Md.Code (2003 Repl.Vol.) Art. 66B and the Open Meetings Act in approving the resolution.

On January 19, 2010, YIM field a Motion to Consolidate Appeals. The circuit court granted the motion on February 22, 2010.

On April 13 and 14, 2010, the circuit court heard arguments regarding the parties' appeals. On May 13, 2010, the court issued its order affirming "the Board's finding of continued nonconforming restaurant use for the first floor of the property at 123–129 West 27th Street," but modifying "the Board's decision by striking the restrictions placed on [YIM's] operation of a nonconforming use restaurant." The court found that the Board's decision was not a modification of a nonconforming use property, nor was it an approval of a "side-by-side" nonconforming use. Regarding the Board's decision that the existing nonconforming use as a restaurant had not been discontinued or abandoned, the court stated that "the Board found that the 'property has been a facility serving food to the public, primarily for on premises consumption by seated patrons for many years,'" and "there is no significant difference between serving patrons bread or other food products on the premises." The court further found no violation of the Open Meetings Act or Article 66B. The court found, however, that the Board erred in placing limitations on the restaurant's operating hours.[9]

On June 14, 2010, appellants filed this timely appeal.[10]

---

**9.** Appellants did not challenge the circuit court's order striking the restrictions regarding operating hours.

**10.** The Charles Village Civic Association, et al., also noted an appeal to the circuit court's order, but it subsequently withdrew the appeal on August 31, 2010.

## STANDARD OF REVIEW

In reviewing a circuit court decision on appeal from an administrative agency decision, "our role 'is precisely the same as that of the circuit court.'" *Tabassi v. Carroll County Dep't of Soc. Servs.*, 182 Md.App. 80, 85, 957 A.2d 620 (2008) (quoting *Howard County Dep't of Soc. Servs. v. Linda J.*, 161 Md.App. 402, 407, 869 A.2d 404 (2005)). We "review[ ] the agency's decision, and not that of the circuit court." *P Overlook, LLLP v. Bd. of County Comm'rs*, 183 Md.App. 233, 247, 960 A.2d 1241 (2008). *Accord Md. Bd. of Phys. v. Elliott*, 170 Md.App. 369, 401, 907 A.2d 321, *cert. denied*, 396 Md. 12, 912 A.2d 648 (2006).

This Court recently set forth the standard of review of an agency decision:

> A court's role in reviewing an administrative agency adjudicatory decision is narrow; it "is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law."
>
> In applying the substantial evidence test, a reviewing court decides "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record. A reviewing court "must review the agency's decision in the light most favorable to it; . . . the agency's decision is prima facie correct and presumed valid, and . . . it is the agency's province to resolve conflicting evidence" and to draw inferences from that evidence.

*Assateague Coastkeeper v. Md. Dep't of the Env't*, 200 Md. App. 665, 690, 28 A.3d 178, 193 (2011) (quoting *Najafi v. Motor Vehicle Admin.*, 418 Md. 164, 173–74, 12 A.3d 1255 (2011)). The Court of Appeals had made clear that "a court's task on review is *not* to 'substitute its judgment for the expertise of those persons who constitute the administrative agency.'" *Najafi*, 418 Md. at 173–74, 12 A.3d 1255 (quoting *Md. Avia-*

*tion Admin. v. Noland,* 386 Md. 556, 571–72, 873 A.2d 1145 (2005)).

## DISCUSSION

Appellants attack the Resolution approving the nonconforming use of the property as a restaurant on four grounds. First, they contend that the Resolution must be reversed because the provision of the Baltimore City Zoning Code ("BCZC") that the Board relied upon in approving YIM's nonconforming use permit was subsequently repealed.[11] Second, appellants argue that the Board's Resolution must be vacated because the Board did not comply with Article 66B and the Open Meetings Act. Third, appellants contend that the Board's finding "that the nonconforming use at issue had not been 'discontinued' contradicted the undisputed testimony and was unsupported by competent evidence." Fourth, they maintain that the Board's Resolution "unlawfully modified the prior nonconforming use of the first floor or a portion thereof, and created ambiguity as to the portion of the first floor to be authorized for 'continued' use as a 'restaurant.' "

Before addressing the merits of these contentions, we will review the zoning laws applicable to the issues presented.

## I.

### Baltimore Zoning Regulations

In 1971, the Baltimore City Council adopted the Zoning Commission's recommendations related to zoning boundaries and established comprehensive zoning laws for the City. Baltimore City Ordinance No. 1051 (April 20, 1971). Pursuant to these laws, the W. 27th Street property is part of the R–8 District, which, as discussed *supra,* allows property to be used as a dwelling and for other limited purposes, not including a restaurant.

---

11. This contention is also the subject of a Motion for Summary Reversal, which was filed by appellants in this Court on January 24, 2011. For the reasons set forth in this opinion, we shall deny this motion.

■ The use of the property here involves a nonconforming use, which is defined as a "lawfully existing use of a structure or of land that does not conform to the applicable use regulations of the district in which it is located." *Trip Assocs. Inc. v. Mayor and City Council of Balt.*, 392 Md. 563, 572–73, 898 A.2d 449 (2006) (quoting BCZC § 13–102). "A valid and lawful nonconforming use is established if a property owner can demonstrate that before, and at the time of, the adoption of a new zoning ordinance, the property was being used in a then-lawful manner for a use that, by later legislation, became non-permitted." *Id.* at 573, 898 A.2d 449.

■ Although a nonconforming use is not favored, it is a vested right entitled to constitutional protection. *Id.* at 573–74, 898 A.2d 449. "Nonconforming uses are usually allowed to continue with the expectation that they will eventually disappear, the objective being to extinguish them as early as possible with due regard to the lawful interest of those entitled to such use." *Stieff v. Collins,* 237 Md. 601, 604, 207 A.2d 489 (1965). A nonconforming use may be eliminated by " '[d]iscontinuance or abandonment,' the failure actively and continuously to operate the nonconforming use." *Trip Assocs.,* 392 Md. at 576, 898 A.2d 449 (quoting BCZC § 13–407).

At the time of the hearing in this case, BCZC § 13–407 provided as follows:

(a) *Discontinuance of use.*

(1) Except as specified in this section, whenever the active and continuous operation of any Class III nonconforming use, or any part of that use, has been discontinued for 12 consecutive months:

(i) the discontinuance constitutes an abandonment of the discontinued nonconforming use, or discontinued part of that use, regardless of any reservation of an intent to resume active operations or otherwise not abandon the use; and

(ii) the discontinued nonconforming use, or discontinued part of that use:

(A) may not be reestablished; and

(B) any subsequent use of any part of the land or structure previously used for the discontinued use, or discontinued part of that use, must conform to the regulations of the district in which the land or structure is located.

(2) In accordance with Subtitle 7 {"Modifications and Continuances by Board"} of this title, the Board may extend the time limit for discontinuance for 1 or more additional periods. In no case, however, may the total of the additional time exceed 12 months.

(b) *Abandonment of use.*

Except as specified in this section, if, at any time, actual abandonment in fact is evidenced by removal of structures, machinery, or equipment, or by alternations that indicate a change in the use of any part of the land or structure:

(1) That action constitutes an abandonment of the nonconforming use, or affected part of that use; and

(2) All rights to continue or reestablish the nonconforming use, or part of that use, immediately terminate.

(c) *Exceptions for R–6 to R–10 Districts.*

This section does not apply to any Class III nonconforming uses in an R–6, R–7, R–8, R–9, or R–10 District.

On June 14, 2010, after the Board's Resolution here, the Baltimore City Council enacted Ordinance 10–289. This ordinance repealed BCZC § 13–407(c), which provided that the provision relating to abandonment of use did not apply in the R–8 district. Accordingly, a nonconforming use in the R–8 district now is subject to elimination by abandonment of use.

## II.

### Subsequent Change in the Law

Appellants' first contention is based on the June 14, 2010, enactment of Ordinance 10–289. They maintain that "the Board and Circuit Court must be reversed [because]

there has been a substantive change in the applicable law during the pendency of this matter." Appellants argue that "the repeal of the abandonment exception is a substantive change in the law" that should be applied retroactively, and that the repeal "has nullified the Board's decision and effectively removed the Board's authority over this matter." According to appellants, because the new rule considers a nonconforming use to be abandoned when use has ceased for a period of 24 months, and the W. 27th Street property has not been used as a restaurant in more than 24 months, this Court should vacate the Board's resolution, without remanding it.

Appellees, YIM and the Mayor and City Council of Baltimore (the "City"), disagree. They argue that the Board's resolution was not based solely on § 13–407(c). Rather, they assert, the Board found that the nonconforming use had not been discontinued or abandoned under BCZC § 13–407(b), and its finding that the § 13–407(c) exception would apply was solely an alternative finding. Accordingly, they argue that the elimination of the § 13–407(c) abandonment exception in the R–8 district does not negate the Board's approval of the continuation of the nonconforming use. We agree.

As set forth, *supra*, § 13–407(c) provided an exception to the rule that the right to a nonconforming use could be lost if the use was discontinued for 12 consecutive months. It provided that the discontinuance or abandonment provision did not apply in certain districts, including the R–8 District in which the W. 27th Street property was located.

The subsequent repeal of this provision does not require reversal of the Board's decision. To be sure, the Board referenced the exception; it stated that if the evidence confirmed that the nonconforming use had been discontinued, the exception would apply. The Board, however, found that the "use had not been discontinued or abandoned." Thus, the change in the law did not impact the primary finding of the Board, and it does not require reversal of the Board's decision.

### III. Open Meetings

Appellants next contend that the Board's resolution must be reversed because its "findings of fact and conclusions of law contained in the October 20, 2009[,] Resolution were not adopted in accordance with Article 66B and the Open Meetings Act." They assert the following violations of the Open Meetings Act: (1) "[t]here was never a public open meeting at which the Board adopted the findings of fact and conclusions of law contained in the Resolution"; (2) "the Resolution is not signed by the Board Members and contains material that was not presented to or discussed in public by the Board"; and (3) "the Board's only public deliberation and vote on the application, which took place five weeks before the Resolution was issued, was minimal at best and was conducted with one member absent but participating via conference telephone."

YIM and the City contend that the Board did not violate the provisions of the Open Meetings Act or Article 66B. They note that the Board held a public meeting regarding the permit on September 15, 2009. They argue that appellants' challenges to the propriety of the Board's deliberations and the lack of an "approval signature" have no basis in the law.

### A. Statutory Requirements for Open Meetings

The Open Meetings Act is codified in S.G. § 10–501 et seq. and is applicable to meetings of "public bodies." [12] According to S.G. § 10–502(g), the term "meet" "means to convene a quorum of a public body for the consideration or transaction of

---

**12.** Md.Code (2009 Repl.Vol.) § 10–502(h)(1), of the State Government Article, defines public body, in part, as follows:

 (1) "Public body" means an entity that:
 (i) consists of at least 2 individuals; and
 (ii) is created by:
 1. the Maryland Constitution;
 2. a State statute;
 3. a county or municipal charter;
 4. an ordinance;
 5. a rule, resolution, or bylaw;
 6. an executive order of the Governor; or
 7. an executive order of the chief executive authority of a political subdivision of the State.

public business." The requirements of the Act apply when a public body meets to consider "granting a license or permit" or "a special exception, variance, conditional use, zoning classification, the enforcement of any zoning law or regulation, or any other zoning matter." S.G. § 10–503(b)(1)(2).

The Open Meetings Act is based on the philosophy that public business should be performed in a public manner, which is accessible to interested citizens, and that this type of open government is " 'essential to the maintenance of a democratic society.' " *Handley v. Ocean Downs, LLC,* 151 Md.App. 615, 633, 827 A.2d 961 (2003) (quoting S.G. § 10–501(a)). "Such open government 'ensures the accountability of government to the citizens of the State[,] . . . increases the faith of the public in government and enhances the effectiveness of the public in fulfilling its role in a democratic society.' " *Id.* (quoting S.G. § 10–501(b)).

S.G. § 10–505 provides that, with certain exceptions, "a public body shall meet in open session," and S.G. § 10–506 provides for advance notice of such a meeting. The Court of Appeals has explained the scope of the Open Meetings Act as follows:

> "While the Act does not afford the public any right to participate in the meetings, it does assure the public right to observe the deliberative process and the making of decisions by the public body at open meetings. In this regard, it is clear that the Act applies, not only to final decisions made by the public body exercising legislative functions at a public meeting, but as well to all deliberations which precede the actual legislative act or decision, unless authorized by [§ 10–508] to be closed to the public. * * * It is . . . the deliberative and decision-making process in its entirety which must be conducted in meetings open to the public since every step of the process, including the final decision itself, constitutes the consideration or transaction of public business."

*Cmty. & Labor United for Balt. Charter Comm. v. Balt. City Bd. of Elections,* 377 Md. 183, 193, 832 A.2d 804 (2003)

(quoting *New Carrollton v. Rogers,* 287 Md. 56, 72, 410 A.2d 1070 (1980)). Pursuant to § 10–510(c), "it is presumed that the public body did not violate any provision of this subtitle, and the complainant has the burden of proving the violation."

Article 66B § 2.08(b) sets forth the specific requirements for meetings conducted by the Board. It provides:

(b) *Rules; meetings; administering oaths; summoning witnesses; records.*—(1) The Board of Municipal and Zoning Appeals shall adopt rules in accordance with any ordinance adopted under this article.

(2) Meetings of the Board of Municipal and Zoning Appeals shall be held at the call of the chairman and at other times determined by the Board.

(3)(i) The chairman of the Board of Municipal and Zoning Appeals or, in the chairman's absence, the acting chairman may administer oaths and compel the attendance of witnesses.

(ii) All meetings of the Board of Municipal and Zoning Appeals shall be open to the public.

(iii) 1. The Board of Municipal and Zoning Appeals shall keep minutes of its proceedings.

2. The minutes shall include the vote of each member on each question, or the member's absence or failure to vote.

3. The Board of Municipal and Zoning Appeals shall keep records of its examinations and other official actions, all of which shall be immediately filed in the office of the Board.

4. The records of the Board of Municipal and Zoning Appeals shall be open to the public.

There is no dispute here that the public was permitted to observe the Board as it discussed whether to approve YIM's nonconforming use permit. Appellants nevertheless assert two reasons why there was a violation of the Open Meetings Act and Article 66B: (1) the Resolution was not signed by all the Board members; and (2) one Board member was not present during deliberations and participated via speakerphone.

### B. Resolution Signed by the Executive Director

 Appellants argue that the Resolution is not a finding of the Board. In particular, they argue:

[T]here was no approval by signature, as the Board members *never signed* the Resolution issued on their behalf on October 20, 2009. This fact, together with the brevity and limited subject matter of the Board's deliberation on September 15, 2009, make it impossible to verify that the Board ever "adopted" the Resolution. Despite the statement in the Resolution that the Board had "adopted" the eight (8)-page Resolution on September 15, 2009, to be sure the Resolution was not "adopted" on that day and was never subsequently adopted in any public open meeting. Stated another way, the contents of the October 20, 2009[,] Resolution were never the subject of *any* motion adopted in public by the Board. The Resolution of October 20, 2009[,] is verifiably the act of [Mr.] Tanner, not the zoning body charged with considering nonconforming uses.

Appellants cite two cases in support of their contention: (1) *Wesley Chapel Bluemount Ass'n v. Baltimore County,* 347 Md. 125, 699 A.2d 434 (1997); and (2) *Armstrong v. Mayor and City Council of Baltimore,* 409 Md. 648, 976 A.2d 349 (2009). Neither case supports appellants' contention.

In *Wesley Chapel,* the Court of Appeals held that the Baltimore County Board of Appeals violated the Open Meetings Article in affirming the approval of a development plan without conducting its deliberations in public. 347 Md. at 134, 149, 699 A.2d 434. In that case, however, the Board of Appeals specifically denied a request to conduct its deliberations in public based on its determination that appeals of development plans did not involve "other zoning matters" subject to the Open Meetings Act. *Id.* at 134, 699 A.2d 434. The Court of Appeals disagreed, but there is no indication in the opinion that where, as here, the Board does deliberate in an open meeting, a subsequent written Resolution signed by less than all of the Board members violates the Open Meetings Act or Article 66.

Similarly, appellants' reliance on *Armstrong* is misplaced. The Court of Appeals' holding in that case did not address the Open Meetings claim on the merits, finding it moot in light of the subsequent enactment of a retroactively applied ordinance. *Armstrong*, 409 Md. at 670, 976 A.2d 349.

In this case, the Board heard testimony at a public meeting, and it subsequently conducted its deliberations in a public meeting, during which the Board voted. Appellants have cited no authority for the proposition that a Resolution subsequently signed by the Executive Director is not valid.[13] Accordingly, appellants have failed to meet their burden of showing a violation of the Open Meetings Act or Article 66B based on the fact that the Resolution was not signed by all the Board members.

### C. Participation by Speaker Phone

■ Appellants next argue that a Board member's participation in the hearing by speaker phone is not authorized by the Open Meetings Act or Article 66B. They argue that both statutes refer to the "presence" of the members of a public body, and that "presence" is commonly understood to mean physical presence. They assert that allowing "presence" at a meeting to be "limited to a disembodied voice, is to allow the public to observe only a part of the meeting, and not the meeting in its entirety as promised by the Open Meetings Act."

YIM and the City argue that "there is no provision in the Open Meetings Act that prohibits a member of the Board from participating in the deliberations and vot[ing]" when not physically present. They assert that "the Act merely requires that citizens be allowed to observe the performance of public officials and the deliberations and decisions of the public body," a requirement the Board complied with when it broad-

---

**13.** We note that prior Board resolutions included in the record, as well as case law, reflect situations where a Resolution was signed by one individual. *See State Housing, Inc. v. City of Balt.*, 215 Md. 294, 295, 137 A.2d 708 (1958) (noting a Board Resolution was signed by the Director of Zoning).

cast the Board Member's participation via speaker phone. They further argue that, even if the vote of the person voting by phone was not counted, "the result in this matter would have been the same because three of the remaining four members voted for the continuation of the nonconforming use."

Some states have specifically addressed whether participation in a meeting by speakerphone or other technology is permissible under their Open Meetings laws. *See* ALASKA STAT. § 44.62.312 (2010) (Open Meetings Act permits teleconferencing for "the convenience of the parties, the public, and the governmental units conducting the meetings."); CAL. GOV'T CODE § 11123 (2010) (Open Meetings Act permits public meetings via teleconference "for the benefit of the public and state body," provided "[a]t least one member of the state body shall be physically present at the location specified in the notice of the meeting"); D.C.CODE § 2–576 (2011) (a "meeting may be held by video conference, telephone conference, or other electronic means"); GA.CODE ANN. § 50–14–1(f) (2011) (permitting meetings by telecommunications conference); KY.REV.STAT. ANN. § 61.826 (2011) (meetings via teleconference permitted under Open Meetings Act); N.Y. PUB. OFF. LAW § 103 (2011) (meetings via videoconferencing permitted, provided the "public body that uses videoconferencing to conduct its meetings shall provide an opportunity to attend, listen and observe at any site at which a member participates"); TEX. GOV'T.CODE ANN. § 551.127 (2010) (meeting by videoconference call permitted if, among other requirements, "a quorum of the governmental body is physically present at one location of the meeting," and each location had "two-way communication with each other location during the entire meeting"). *See also* 2011 ALA. PUB. ACT 159 (establishing a Joint Interim Legislative Committee on Open Meetings Legislation to study "the drafting of a new or revised Act that will allow for meetings of public boards and agencies by teleconference").

Maryland's Open Meetings Act and Article 66B, by contrast, do not expressly address the use of telephone conference or other technology to conduct meetings. The lack of specific

authorization to engage in this procedure, however, does not mean that it is prohibited.

Maryland's Open Meetings Act defines "meet" as "to convene a quorum of a public body for the consideration or transaction of public business." S.G. § 10–502(g).[14] "Convene" is defined as follows: (1) "To call together; to cause to assemble." BLACK'S LAW DICTIONARY 355 (8th ed. 2004); and (2) "to come together in a body," "to summon before a tribunal," or "to cause to assemble." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 286 (1987). "Assemble" means "to bring together (as in a particular place or for a particular purpose)." *Id.* at 109.

Article 66B refers to the Board members being "present" to vote to reverse a decision of an administrative officer. Art. 66B § 2.08(i)(1) and (2). The term "present" is defined as: "In attendance; not elsewhere." BLACK'S LAW DICTIONARY, *supra* at 1221.

Although the language of these statutes suggests physical presence, we believe the term "present" and "convene" can encompass participation through the use of technology. We find the analysis discussed in *Freedom Oil Co. v. Illinois Pollution Control Board*, 275 Ill.App.3d 508, 211 Ill.Dec. 801, 655 N.E.2d 1184, 1191 (1995) instructive in this regard.

In *Freedom Oil*, the Illinois Appellate Court addressed whether the use of telephone conferences fell within the definition of a meeting under the Open Meetings Act. *Id.*, 211 Ill.Dec. 801, 655 N.E.2d at 1189. The Illinois Open Meetings Act defined "meeting" as "a gathering of a quorum." *Id.*, 211 Ill.Dec. 801, 655 N.E.2d at 1190. The court found persuasive an opinion by the Attorney General, which found: (1) although a "gathering" suggests "physical coming together of persons," with the existing technology, "a group of persons may come together by 'non-corporal' means as well"; (2) where "a tele-

---

14. "Quorum" is defined as "a majority of the members of a public body" or "any different number that law requires." S.G. § 10–502(k)(1) and (2).

phone conference call is broadcast over a speakerphone so the broadcast is open to members of the public . . . accessibility of the public is satisfied"; and (3) "a meeting held by telephone conference . . . complies with the Open Meetings Act." *Id.*

The court noted that specific statutory authority to conduct some meetings by telephone conference was not required. *Id.* The court emphasized that the Illinois Pollution Control Board complied with the applicable rules necessary to hold a hearing, including posting public notice of the hearing and keeping minutes, and it noted that there was no evidence that the complaining party was unable to hear the telephone conference. *Id.*, 211 Ill.Dec. 801, 655 N.E.2d at 1191. Accordingly, it rejected the argument that the Board had no authority to conduct a meeting by telephone conference. *Id.*, 211 Ill.Dec. 801, 655 N.E.2d at 1189.

The Michigan Court of Appeals similarly found no violation of the state's Open Meetings Act by administrative hearings via telephone conference calls. *Goode v. Dept. of Soc. Servs.*, 143 Mich.App. 756, 373 N.W.2d 210, 212 (1985). The court stated:

> "We find no problem with the holding of hearings via teleconference calls. Such calls are heard through speaker phones and are audible to all in the room. Persons who wish to attend the hearing are allowed to do so and may attend at either location. The conference call set-up actually increases the accessibility of the public to attend, as now more than one location is open to the public. While we recognize that to actually see and observe all the witnesses and the hearing officer is desirable, we do not find it necessary."

*Id.* (footnote omitted), *leave to appeal denied*, 424 Mich. 874, 380 N.W.2d 42 (1986). *See also Clausing v. State*, 90 Wash. App. 863, 955 P.2d 394, 400 n. 6 (although the Open Meetings Act did not apply, the court observed that, "[i]n this modern technological era," "video conferencing, internet conferencing, and telephone conference calls" are methods that "allow persons to be 'present' to one another without the demands often

required to achieve physical presence."), *review denied,* 136 Wash.2d 1020, 969 P.2d 1063 (1998). *See also* Office of the Attorney General, *Open Meetings Act Manual* 7–8 (4th ed. 2000) ("a telephone conference call in which a quorum of members is conducting business simultaneously . . . is a 'meeting,' " but the public must have access to the discussion via speakerphone).

■ We agree with this reasoning. There is nothing in Maryland's Open Meetings Act or Article 66B that prohibits a meeting with one or more members participating by telephone conference, as long as the conference call is broadcast over a speakerphone so it can be heard by members of the public. Such a meeting satisfies the requirement of accessibility to the public.

■ In this case, the Board member who was not physically present participated via speakerphone, and there is no indication that anyone was unable to hear her comments. To the contrary, appellants' self-transcribed transcript indicates that the Board member was audible to those who attended the hearing. Accordingly, we hold that the Board did not violate the Open Meetings Act or Article 66B in approving YIM's nonconforming use permit where one voting member was present by speaker phone.[15]

---

**15.** Even if we had found a violation of the Open Meetings Act, appellants would not be entitled to the relief sought. Pursuant to S.G. § 10–510(d)(4), a court may void an action violative of the Open Meetings Act only when the aggrieved party demonstrates that a government body "willfully failed to comply" with the requirements of the Act. *See Handley v. Ocean Downs, LLC,* 151 Md.App. 615, 641, 827 A.2d 961 (2003) (before a court may void a Board's action, "it must determine that the Board 'willfully failed to comply' with the Act, and that no other remedy is adequate") (quoting S.G. § 10–510(d)(4)). *Accord Armstrong v. Mayor and City Council of Baltimore,* 409 Md. 648, 684, 976 A.2d 349 (2009); *Wesley Chapel Bluemount Ass'n v. Baltimore County,* 347 Md. 125, 129, 699 A.2d 434 (1997). Appellants have not asserted that the Board willfully failed to comply with the Open Meetings Act.

Additionally, Article 66B § 2.08(i)(2) provides: "If only four members of the Board are present, the concurring vote of at least three members is necessary to take any action under this subsection." Appellants

## IV.

### Substantial Evidence

▮▮▮ Appellants contend that "the Board and Circuit Court may not be affirmed, when the finding of the Resolution that the nonconforming use at issue had not been 'discontinued' contradicted the undisputed testimony and was unsupported by competent evidence." They argue that the property owner's undisputed testimony at the hearing was that operations of the restaurant had ceased at the end of May 2008, and the only evidence of a restaurant operating after that date was an affidavit submitted by Mr. Raghubar, which stated that Mr. Raghubar had managed events at the restaurant in April, May, and June 2009. Appellants assert that the Board's reliance on the affidavit was inappropriate because: (1) it contradicted the testimony of Mr. Goldberg stating that restaurant operations had ceased in June 2008; (2) it was submitted after the hearing.[16]

YIM contends that the Board's decision was based on substantial evidence. Initially, it notes that "the tenant filed a use permit application on May 11, 2009, within 12 months of the date that Appellants[ ] claim the nonconforming use ceased." It argues that, "[b]ased on this fact alone, the Court should uphold the finding of fact that this property contained a

---

acknowledged in their filings in the circuit court that four Board members were present, that the Board voted to approve the Resolution, and that only one Board member opposed the Resolution. Thus, three out of four Board members physically present at the hearing voted to approve YIM's nonconforming use permit. For this reason as well, appellants are not entitled to the relief sought.

**16.** Appellants further argue that discontinuation was never publicly discussed by the Board. This contention is belied by the record. At the initial hearing, counsel for each of the parties addressed whether the use of the property as a restaurant had been abandoned or discontinued. Moreover, according to a transcript submitted by appellants, which purports to reflect the Board's deliberation, two Board members specifically addressed the issue of abandonment, stating that the threshold for such a showing had not been met. Although we are not commenting on the propriety of submitting this transcript, we do note that the contents are contrary to appellant's assertions.

long-standing nonconforming restaurant use that was not discontinued or abandoned." YIM further points to the affidavit of Mr. Raghubar, "who stated that he was the manager of the restaurant from January 2009 through June of 2009." [17]

The City similarly contends that the Board's decision was supported by substantial evidence. It emphasizes that city records established that the W. 27th Street property was used as a restaurant beginning "several years before the enactment of the 1971 comprehensive zoning ordinance" and that the use was a lawful nonconforming use. The City further states that none of the people opposing the use permit "presented *any* evidence showing that the nonconforming use had been either discontinued or abandoned." Finally, the City argues that the testimony of Mr. Goldberg established that, "but for the error committed by an employee in the zoning office in May[ ] 2009, a permit would have been issued earlier in accordance with the lease entered into soon after the Two Sisters Bar and Grille had vacated the premises."

As indicated, the BCZC provides that, where "the active and continuous operation" of the "nonconforming use ... has been discontinued for 12 consecutive months," the discontinuance constitutes an abandonment of the use, and the discontinued nonconforming use may not be reestablished. BCZC § 13–407(a). A determination whether a use has been discontinued is a " 'question of fact not of law.' " *Peck v. Balt. County*, 286 Md. 368, 374, 410 A.2d 7 (1979) (quoting G. THOMPSON, REAL PROPERTY § 443 (J. Grimes ed. 1961)). We must affirm the Board's conclusion if it is supported by substantial evidence. *Critical Area Comm'n v. Moreland, LLC*, 418 Md. 111, 122, 12 A.3d 1223 (2011) ("Our role in

---

17. In its brief, YIM further argues that the Board "had no legal authority to impose a time restriction on the nonconforming use." The City responded that YIM's "argument regarding error by the Board by placing time restrictions on the use of the restaurant is not properly before" this Court. We agree. The circuit court resolved that issue in YIM's favor. Mr. Tuzeer did not raise the issue in his brief, and the City did not file a cross-appeal. Accordingly, we will not address the issue.

reviewing the final decision of an administrative agency, such as the Board of Appeals, is 'limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions.'") (quoting *Noland*, 386 Md. at 571, 873 A.2d 1145).

Here, Mr. Goldberg testified that the property had not been used as a restaurant since Two Sisters left at the end of May 2008. YIM contends, however, that its application for a use permit in May 2009, within 12 months of the date appellants claim the nonconforming use ceased, supports the Board's finding that the restaurant use was not discontinued or abandoned. It cites no law, however, in support of its assertion that a permit application would constitute "active and continuous operation" of restaurant use.

To be sure, the application for a use permit, as well as obtaining the permit for interior painting and the efforts to obtain a tenant, is relevant to the determination of discontinuance of the nonconforming use of the property as a restaurant if a finding of discontinuance requires an intent by the owner to abandon the use. Intent, however, is not dispositive in this case.

Generally, a finding of abandonment requires the "concurrence of two factors, (a) an intention to abandon and (b) some overt act, or some failure to act, which carries the implication that the owner does not claim or retain any interest in the subject matter." *Dorman v. Mayor and City Council of Balt.*, 187 Md. 678, 684, 51 A.2d 658 (1947). In this case, however, BCZC § 13–407 specifically provides that the cessation of "active and continuous operations of any . . . non conforming use . . . for 12 months" constitutes an abandonment of the use "regardless of any reservation of an intent to resume active operations or otherwise not abandon the use." Thus, even if the application for the permit and the efforts to get a new tenant are inconsistent with an intent to abandon the restaurant use, the intent to abandon is not an issue for us to consider.

■ As indicated, however, a finding of abandonment requires "some overt act, or some failure to act, which carries the implication that the owner does not claim or retain any interest in the subject matter." *Dorman*, 187 Md. at 684, 51 A.2d 658. If there is a "failure of action for a sufficient period of time, then the owner has lost his right to the non-conforming use." *Id.*

■ Abandonment in this context "focuses not on the owner's intent, but rather, on whether the owner failed to use the property as a nonconforming use in the time period specified in the zoning ordinance." *Trip Assocs.*, 392 Md. at 577, 898 A.2d 449. The abandonment or discontinuance, however, "must be active and actual." *Id.* Here, there was not a failure to act for 12 months.

YIM introduced evidence demonstrating its efforts to obtain alternate tenants, including signing a lease with Mr. Weishaus in December 2008, and, after the community had an acrimonious meeting with Mr. Weishaus, signing a new lease with Mr. D'Souza. YIM filed two permit applications, one in March 2009 for interior and exterior painting and repair of drop ceiling tile, and one on May 11, 2009, for a continuation of a restaurant use permit. All of these efforts were made within twelve months of the prior restaurant closing.

Under these circumstances, the Board properly could find there was not an "active and actual" abandonment or discontinuation after Two Sisters closed at the end of May 2008. There was substantial evidence to support the Board's Resolution.

## V.

### Modification

Appellants' final contention is that the "Board and Circuit Court may not be affirmed[ ] when the October 20, 2009[,] Resolution unlawfully modified the prior nonconforming use of the first floor or a portion thereof, and created ambiguity as to the portion of the first floor to be authorized for 'continued'

use as a 'restaurant.'" They maintain that the Resolution could not constitute an approval of a continued nonconforming use of the W. 27th Street property because the Resolution divided the space into two distinct commercial uses—a restaurant and a bakery—whereas the property previously had been approved to operate as a single commercial entity—a kitchen to make baked goods as an "accessory to the existing tavern." Accordingly, they maintain that the Board's Resolution was an unlawful modification of a nonconforming use.

We agree with YIM and the City that this contention is without merit. The Board's finding was that "the use of this property as a restaurant ... can continue." YIM did not request, and the Board did not grant, any modification to the nonconforming use.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. APPELLANTS' MOTION FOR SUMMARY REVERSAL DENIED. COSTS TO BE PAID BY APPELLANTS.**